ROSS WOLLEN, GRACE F. WOLLEN AND MARY BOHR-
MANN, PLAINTIFFS-APPELLANTS, v. BOROUGH OF
FORT LEE AND MAYOR AND COUNCIL OF THE BOR-
OUGH OF FORT LEE, DEFENDANTS-RESPONDENTS.

Argued May 5, 6, 1958—Decided June 25, 1958.

*Mr. James Rosen* argued the cause for the appellants (*Messrs. Milmed & Rosen,* attorneys).

*Mr. William V. Breslin* argued the cause for the respondents (*Mr. William J. Scanlon,* of counsel).

The opinion of the court was delivered by

HEHER, J. At issue in this proceeding in lieu of *certiorari* is the validity of an ordinance adopted March 6, 1957 pur-

porting to amend and supplement the zoning ordinance of the defendant Borough of Fort Lee. The amendment would reduce the land area of district R–1A, restricted to one-family residence use and a "minimum lot area" of 10,000 square feet, and constitute the separated land a new R–7 Multi-Story Apartment District open to apartment houses not in excess of six stories in a given area and not in excess of 14 stories and penthouse elsewhere in the district.

There was judgment for defendants; and we certified, *sua sponte,* plaintiffs' appeal to the Appellate Division of the Superior Court.

The history of the measure now under attack is pertinent to the inquiry. As first proposed, January 2, 1957, the subject lands comprised approximately 44 acres, known as the Palisade East tract. The proposal came from the board of liquidation established by the borough under *R. S.* 52:27–45.3 to effect a plan of composition of the debts of the borough and the School District of Fort Lee, presented in proceedings brought by the borough in the United States District Court for the District of New Jersey under chapter IX of the Bankruptcy Act, 11 *U. S. C. A.* § 401 *et seq.,* and to that end "to effect, manage and control the liquidation of the assets thereby pledged to the Liquidating Fund in a speedy, efficient and economical manner," and to "compromise, adjust or otherwise settle any certificates of tax sale or tax and assessment title liens, or other receivables included in the assets," and to foreclose certificates of tax sale or tax and assessment title liens included in the assets, and to "liquidate the properties and assets by sale, exchange, lease or other disposition at such time or times and for such price or prices as the Board shall deem reasonable and expedient."

As found by Judge Broadhurst, the Palisade East tract is a "five-sided area"; the easterly boundary "is the edge of a cliff"; it is "about 2,300 feet long"; the "southerly boundary (Wilson Road) is about 500 feet long"; the "southwesterly side is 1,400 feet, the westerly side 1,900 feet, and the northerly side (West View Avenue) 550 feet in

length," and it "contains 44 to 45 acres"; to the west of the Palisade East tract and "running generally parallel with its westerly boundary is Route 9–W (locally called Palisade Avenue)," "a super highway 75 feet wide and the principal northbound feeder road to the nearby George Washington Bridge"; approximately 1,500 feet of the tract "abuts on 9–W"; the "entire tract still remains in its virgin state," "heavily wooded"; the "land slopes downward in varying but substantial degrees to the edge of the cliff"; it has "a tremendous deposit and overburden of diabase rock"; and "the area contains no houses, streets or facilities of any kind."

And the ownership of the tract when the ordinance was first introduced, January 2, 1957, follows: "Board of Liquidation, 132 lots, 17.33 acres; Borough of Fort Lee, 16 lots, 2.05 acres; private ownership, 44 lots, 5.41 acres; paper streets, 6.33 acres."

By a resolution adopted May 9, 1956, the board of liquidation made known that it had accepted an offer submitted by Alexander Summer, Inc. on August 15, 1955 to purchase all of the lots in the Palisade East tract for the sum of $309,400, conditioned (a) on Summer's acquiring the "63 lots in the tract" then in private ownership, and (b) a rezoning of the lands "to permit the erection of multiple story apartment buildings * * * not [to] occupy more than 20% of the total ground area"; that Summer had acquired "by purchase or contract, all of the privately-owned lots"; and that the board had unanimously concluded that it would be in the essential public interest to amend the zoning ordinance accordingly, for these reasons in particular: (1) the consummation of the sale would restore "ratables * * * of many acres of land" which had been "off the tax rolls for a quarter of a century, plus the millions of new ratables which will result from the improvements contemplated thereon"; and (2) this would "greatly improve" the borough's "financial position for the future and probably result in raising the rating on its outstanding bonds"; (3) it would "bring a vast amount of new purchasing power into the community through which every merchant

and every citizen engaged in the professions should benefit";
(4) it would "produce a very sizable reduction in the
annual tax bills for every taxpayer"; and (5) it would
"result in the early termination of the Board of Liquidation."

On May 17, 1956, the borough clerk forwarded to the
planning board a copy of the resolution adopted by the board
of liquidation and a proposed amendment to the zoning ordi-
nance, advising that the resolution had been "read" at a
meeting of the governing body held the preceding day "and
referred to the Planning Board for recommendation."

The planning board enlisted the professional aid of Com-
munity Planning Associates, Inc. as to the "desirability and
feasibility" of the multi-family apartment use in the area;
the result was a comprehensive study of the proposal and
a report made July 9, 1956 certifying the consultant's con-
sidered judgment that "due to its physical features, its
location and the general characteristics of the immediate
vicinity," the tract in question "is well suited for develop-
ment as a multi-family apartment zone and would be unrea-
sonably and unrealistically regulated if confined only to the
potential of single-family development," and the multi-family
apartment use "represents the highest, best and most appro-
priate use of land to which this area can logically and
economically be put," and recommending an amendment of
the master plan accordingly.

On July 19, 1956, the planning board held a public hear-
ing of the question on notice; on July 26 there was a special
meeting, open to the public, for a further discussion of the
proposal; on November 16 it conferred in joint session with
the governing body and the board of liquidation; and on
November 20, 1956, after consideration of a report made by
a subcommittee of the board, it adopted unanimously a resolu-
tion recommending to the governing body that the land be
rezoned to permit "multi-apartment house dwellings."

On January 2, 1957 the ordinance was introduced and a
hearing before the governing body was set for February 6.

On January 14, 1957 the borough clerk advised the plan-
ning board, by letter, that the proposed ordinance had been

amended to eliminate a provision respecting the height of the apartment buildings above the center line of the street, and to correct a seeming error not relevant to this inquiry; and the letter and a copy of the amended draft were read at a meeting of the planning board held the following day.

On January 29, 1957 the borough clerk forwarded to the planning board for review another proposed amendment to the ordinance, the nature of which is not revealed by the record.

On February 5, 1957 the planning board returned the measure to the governing body with certain recommendations involving the "interests" of adjoining landowners and the "community as a whole"; and on the following day the governing body adopted an amendment of the draft "establishing zone boundaries, with respect to R–7 Districts, and establishing therein a buffer zone," as Judge Broadhurst found. And the findings continue thus:

"* * * At this meeting a resolution was passed directing the Borough Clerk to publish said ordinance as amended and notice of a public hearing to be held February 27th. The buffer zone created by the amendment of February 6, 1957 skirted the entire Palisade East tract except: (1) At the northerly end, where it abuts an area already zoned and used for six-story apartment houses; and (2) along the edge of the cliff. The buffer zone varied in width. At the north end of the west side it was 70–75 feet; midway on that side 100 feet; at the southerly end of that side 250 feet and at the south end 50 feet. This buffer zone reduced the usable area from 43 to about 34 or 35 acres. It did not adversely affect anyone except the owners of the Palisade East tract and they do not complain."

On February 7, 1957 the proposed ordinance, as so amended, was resubmitted to the planning board for consideration, with notice that the measure would come before the governing body for action on February 27 ensuing.

On February 15 the ordinance, as amended, was duly published; and on February 19 the planning board approved the draft, as amended, subject to two recommendations, the nature of which and the subsequent proceedings are thus recorded in the findings made below:

"\* \* \* One was that the outer 50 feet of the buffer zone for the major part of its westerly boundary be used solely as a landscaped area retaining as much as possible its natural growth of trees, etc. The other was that a certain adjacent area be zoned for R–2 residential use.

On February 20, 1957, a public hearing was held by the Mayor and Council. The Planning Board's report above was read. A resolution adopting the amendment proposed by the Planning Board first mentioned was adopted. The Borough Attorney presented a report on the legal aspects of proper zoning and outlined the fundamental duty of the Mayor and Council to act in the best interests of the entire Borough and for no other reason. The Borough Engineer submitted an exhaustive report concerning the topography of the area, storm drainage outlets, the trunk sewer realignments, the land development and street improvements, and the frontage cost for improvements. The Borough Auditor submitted a statistical report indicating the gains the Borough would realize if the area was re-zoned.

One cannot fail to be impressed, from an examination of these reports, as to the thoroughness of the investigation to determine which type of Zone District should prevail for Palisade East tract.

After hearing objections and favorable comment from the public audience, the Mayor and Council reserved decision on the Ordinance until March 6, 1957.

On March 6, 1957 the Ordinance as amended was passed by the Mayor and Council."

And reference was there made to the prior zoning history. The borough's "Building Zone Map of 1941, revised as of January and September, 1953" reveals that the Palisade East tract was zoned for six-story apartment houses, and so also the area immediately to the north. Some time before July 1953 Morrow Planning Associates was retained by the governing body to study and report "on the replanning and rezoning of the Palisades Cliff frontage, southerly from the George Washington Bridge," including the lands in question: and the recommendation made by this consultant, having in view the "coordination" of the tract with the "impending over-all replanning project for the Borough as a whole," was that the "Palisades East Area be replanned for multi-story apartment dwellings."

The findings there made and reported are thus summarized in Judge Broadhurst's conclusions:

"\* \* \* Among many other cogent reasons it pointed out the practical fact that because of the topography (marked and varying slope to the edge of an eroding cliff) and the subsurface solid rock conditions it would be economically impossible to develop the area for private residences. Apparently, Morrow Associates were still working on an 'impending over-all planning project' because in 1955 (date not discoverable) they filed a Report No. 1 and a Master Plan dated May, 1955.

Strange as it may seem, Morrow Associates either forgot their 1953 conclusions and recommendations or for some reason changed their minds because in their 1955 reports they recommended rezoning of this area to a residential district. This without even explaining any reason for the sudden change of opinion. The Mayor and Council rezoned the Palisade East tract to a residential district and it so remained until the present zoning amendment was passed. The Master Plan of 1955 was adopted by the Planning Board and filed with the Mayor and Council. The Mayor and Council took no action either approving or disapproving this Master Plan."

I.

The basic point made is that the action of the governing body purporting to be an amendment of the zoning ordinance was taken in violation of the "mandatory requirements" of *R. S.* 40:55–35 "and the applicable decisional law," and so it "is illegal and void."

*R. S.* 40:55–35, as amended by *L.* 1948, *c.* 305, provides that zoning "regulations, limitations and restrictions" may be amended, changed, modified, or repealed, and the boundaries of the various districts may be changed by ordinance, but no amendment or change shall become effective "unless the ordinance proposing such amendment or change shall first have been submitted to the planning board, when such board exists, for approval, disapproval or suggestions," and the planning board "shall have a reasonable time, not less than thirty days, for consideration and report, and in the case of an unfavorable report by the planning board such amendment shall not become effective except by a favorable vote of two-thirds of the governing body."

The same favorable voting ratio is required where there is a protest against such proposed change signed by the owners of 20% or more "either of the area of the lots or

land included in such proposed change, or of the lots or land in the rear thereof extending one hundred feet therefrom, or of the lots or land on either side thereof or directly opposite thereto extending one hundred feet therefrom," exclusive of street space. So much for the essential policy.

A. Invoking the doctrine that municipalities have "no powers other than those delegated by the Legislature, and must perform their prescribed activities within the statutory ambit," citing *Scatuorchio v. Jersey City Incinerator Authority,* 14 *N. J.* 72 (1953), it is said that the "governing body having given the planning board less than the prescribed minimum period of time for consideration and report, and the planning board having accepted the reduction in time and acted within it, their respective actions are illegal and void." The argument proceeds on the hypothesis that "from the action taken by the governing body on February 6, 1957 and from the letter of the Borough Clerk to the Planning Board of February 7, 1957," "it is clear * * * that the Planning Board was being given until February 27, 1957 (ten days less than the statutory minimum) to act on the proposed amendment," and the board's "acquiescence * * * in such limitation, as evidenced by its letter of February 19th, 1957, constituted clear violations of the mandatory procedural requirements of *R. S.* 40:55–35, rendering the purported amended ordinance a nullity."

█ But this is a misconception of the statutory design. The object and policy of the provision is to afford the planning board, if such there be, a reasonable time, not less than the given period, for consideration of the proposed amendment or change and "approval, disapproval or suggestions," and report accordingly. This is made a precondition to action by the governing body; but when final action is taken by the planning board within the allotted minimum time, the condition precedent is fulfilled and the governing body may then proceed according to the statute. The planning board may have a reasonable time, not less than 30 days, for the performance of its statutory function, but it may act in less time and, if it does, the statutory prerequisite is

met. Elapse of the 30-day period is not a jurisdictional *sine qua non* once the planning board has taken conclusive action.

The inquiry in the ultimate analysis is the true intention of the law; and, to this end, the particular words are to be made responsive to the essential principle of the law. It is not the words but the internal sense of the law that controls. *In re Roche's Estate,* 16 *N. J.* 579 (1954); *Alexander v. New Jersey Power & Light Co.,* 21 *N. J.* 373 (1956).

B. But, it is affirmed, "[t]he attempt by the governing body to control the determination of, the Planning Board rendered the resulting amendatory" action void.

The argument is that the "actions and course of events" reveal "the thinking of the governing body" to enact "amendatory zoning regulations which would satisfy the demands and requirements" of Summer, the prospective purchaser of the lands, "as well as the requests of the Board of Liquidation"; that the letter "referral of the ordinance as amended February 6, 1957, to the Planning Board by the Borough Clerk on February 7, 1957," not only provided "a short deadline for Planning Board consideration of the amendatory ordinance—but the specific course of action desired was unequivocally stated," in these words: "The Mayor and Council requests the approval of the Planning Board for the said ordinance," denounced as a communication "not only in derogation of the mandatory requirement" of the statute, *R. S.* 40:55–35, as amended, but "a blatant attempt on the part of the governing body to interfere with the required independent action of the Planning Board" which rendered the "amendatory ordinance a nullity."

There is no basis in these conditions for the claimed inference of undue interference with the independence of the planning board. The letter was the clerk's way of transmitting the stated action; the minutes recording the governing body's action lend no support to the implication thus given the clerk's interpretation. The statute provides, *L.* 1953, *c.* 433, *N. J. S. A.* 40:55–1.4, that the planning

board shall consist of not less than five nor more than nine members, including the mayor, one of the officials of the municipality to be appointed by the mayor, and a member of the governing body to be appointed by it. The planning board here was so constituted; and there is no suggestion of pressure or undue influence exerted by the mayor or the board's member appointed by the governing body, or that its members were conscious of a compelling influence or constraint of will. Such an inference from the circumstances or the action taken would be purely speculative, an arbitrary assumption of cause and effect.

## II.

It is next urged that the amendatory measure "was not published in full prior to its final adoption on March 6, 1957," and therefore "was never legally adopted."

The Palisade East tract covered by the proposed amendment introduced January 7, 1957 comprised 44 acres. The amendments of the measure adopted February 6, 1957 eliminated approximately nine acres from the original area, substituted an R–2 district for one R–1A district, and established a "buffer zone" in which accessory uses, e. g., off-street parking and garages, would be permissible. The amendatory draft, as thus amended, was published.

But on the ensuing February 27 the governing body adopted a resolution directing a further amendment of the measure, "Section 4 Zone Boundaries of Article II," to provide that the "westerly 50 feet of the * * * described boundaries from the northerly side of Mohegan Way along Buckingham Road to the northerly line of Wilson Road" shall be used for "entrance ways and for landscaping purposes only," but not for "the erection of any building, principal or accessory, or accessory use," thereby leaving the "balance of the buffer zone" open for the accessory off-street parking and garage uses. And it is affirmed that the proposed amendment "closed the door upon a particular and individualized property use" in the designated area, thereby

imposing an "enlarged restraint upon the use of this particular section of the land," deemed a substantial alteration of the ordinance and as such ineffective for want of publication ordained by *R. S.* 40:49–2, as amended by *L.* 1955, *c.* 121, providing that if an amendment be made to an ordinance after first reading, "substantially altering the substance of the ordinance," the ordinance as so amended shall not be finally adopted until published as therein prescribed with notice of the time and place when and where the amended ordinance will be "further considered for final passage."

Not every amendment is required to be published: only such as "substantially alter" the "substance" of the ordinance; and this amendment is plainly not in that category. The inquiry involves a mixed question of law and fact. The judge found "as a fact" that the amendment "was not a substantial change altering the substance of the ordinance as it was published on February 15, 1957." And it was held that "the change did not adversely affect the plaintiffs"; they "were benefited by the change"; "[t]he only ones adversely affected were the owners of the property re-zoned and they do not complain."

The words are to be assessed in the context of the provision of which they are a part and the basic policy of the statute. "Substance" in the statutory intendment has reference to the essential elements of the legislative act and the public policy of acts *in pari materia.* In relation to the altered use-classification of the tract itself, the establishment of a "buffer" zone 50 feet wide for entrance ways and landscaping usable in part for off-street parking and garages was patently incidental to the fulfillment of the basic project, secondary or minor in a design for the highest and best use of the lands in the exercise of the zoning process. Compare *Manning v. Borough of Paramus,* 37 *N. J. Super.* 574 (*App. Div.* 1955), Jayne, J. A. D. And the "enlarged restraint," if such it be, imposes no burden on plaintiffs; they are not aggrieved. See *State v. Council of Newark,* 30 *N. J. L.* 303 (*Sup. Ct.* 1863). The statute has in view pragmatic considerations that would not be served by holding republica-

tion of the amendment requisite in these circumstances. The act is to be given a reasonable construction to advance the essentials of the avowed policy.

## III.

And there is nothing of substance to the point that the ordinance fails because of the participation in its adoption of "three Borough Councilmen disqualified by bias and prejudice in prejudging the issue."

The ground of the attack is that in view of the "protest against the ordinance filed under *R. S.* 40:55–35," the "favorable vote of two-thirds of all the members of the governing body was needed" to adopt the amendment (the vote in favor was 4 to 1, the Mayor not voting and a member of the council being absent), and three of the council, Messrs. Hoebel, Pattwell and Howell, who voted in favor of the ordinance, "had, while they were candidates for election to the Borough Council in the November 1956 General Election, publicly announced that if elected they would vote in favor of rezoning Palisade East for multi-family dwellings," and were thereby disqualified from participating in the enactment of the ordinance.

But this is the democratic process; and it would be contrary to the basic principles of a free society to disqualify from service in the popular assembly those who had made pre-election commitments of policy on issues involved in the performance of their sworn legislative duties. Such is not the bias or prejudice upon which the law looks askance. There is no showing that the minds of these councilmen were not open to conviction in the just fulfillment of what they severally conceived to be a solemn obligation to the community. Otherwise, representative democracy would be subverted, and local self-government denied. Here, for example, the local legislative exercise of the constitutionally-secured land-use control as a police function would be rendered nugatory for the time being by the election of municipal governors whose revealed views on policy had coincided with the popular will and had evoked popular

approval. And three defeated candidates for the council had made public avowal of their intention to vote against the rezoning of the Palisade East area for multi-family dwellings. The contrary rule of action would frustrate freedom of expression for the enlightenment of the electorate that is of the very essence of our democratic society; it would be a negation of the principle of popular sovereignty. But this is not to say that pre-election pledges shall override constitutional and statutory principle and thus make zoning policy the subject of direct participation by the electorate, in the nature of a referendum. The process is legislative; and the governing body is sworn to conforming legislative action.

And there is no ground for the contrary hypothesis here. There is no showing of an abuse of power—no basis for the conclusion of arbitrary action. The course taken was in the pursuit of what was in good faith conceived to be the essential public interest after long and earnest study, aided by experiential advice of unquestionable validity. We are not here concerned with the taint of self-interest in opposition to the public interest and welfare. Compare *Pyatt v. Mayor & Council of Borough of Dunellen,* 9 *N. J.* 548 (1952); *Aldom v. Borough of Roseland,* 42 *N. J. Super.* 495 (*App. Div.* 1956).

### IV.

Finally, it is urged that the ordinance, as amended, is "legally insufficient and ineffective" for non-compliance with the requirements of the zoning statute, *R. S.* 40:55–30 *et seq.,* as amended.

These are the points made: (a) the regulations "are not uniform for the uses of the land throughout the district"; (b) the ordinance, as amended, "is an attempt at partial rezoning and not in accordance with a comprehensive plan"; and (c) the rezoning of the "Palisade East tract from an R–1A district to an R–7 district was 'spot' zoning and 'tailor made' for Alexander Summer, Inc."

And this is the sum of the argument: the original measure introduced January 2, 1957 covered 44 acres then zoned

R–1A, a one-family use district, except the northerly portion, zoned R–5, a six-story apartment house use; the amendment of February 6, 1957 reduced the area from 44 to 35 acres, placing the 35 acres in the R–7 use-classification, embracing 14-story apartment houses, and the remaining adjacent nine acres in the original R–5 district; an area of land adjoining the 35-acre tract on the southwest, comprising 3.432 acres, was rezoned from R–1A to R–2, a one-family district requiring less than a lot minimum of 10,000 square feet; and a buffer zone was established within the 35-acre area, a district "irregular in size, ranging in depth from 190 feet to 50 feet," in which off-street parking and garages would be permissible accessory uses, while the adopted amendment of February 27, 1957 excluded such accessory uses in a portion of the buffer zone so created; and so, it is said, there is a lack of uniformity and comprehensiveness of plan at variance with the statutory rule of action, citing *Schmidt v. Board of Adjustment, Newark,* 9 *N. J.* 405 (1952); *Borough of Cresskill v. Borough of Dumont,* 15 *N. J.* 238 (1954), these among others of like tenor.

It is pointed out that in August 1954 the governing body amended the then existing zoning ordinance to classify a "substantial portion" of the land in question as R–1A, following a recommendation of the planning board created the prior year, and that in 1955 the planning board adopted a master plan which continued the Palisade tract in an R–1A district, "or four families to an acre"; and it is said that the given departure from the master plan "was not the product of comprehensive planning for the public well-being, but rather a submission to an individual interest [Summer] in defiance of the Master Plan proposed by consultants retained and paid to advise and resolve the planning and zoning problems of the municipality," and the governing body's undertaking by section 15 of Article VII of Resolution I of the Plan of Composition approved in the bankruptcy proceeding to "do and perform all acts, deeds and things as may be required" by the board of liquidation in order to effectuate the sale of the board's real property, including amendments

to the borough's zoning ordinances and building codes, is characterized as "zoning by contract" contrary to the principle of *V. F. Zahodiakin Engineering Corporation v. Zoning Bd. of Adjuslment, Summit,* 8 *N. J.* 386 (1952), and thus the amendment of the ordinance was not adopted "in furtherance of a comprehensive plan but solely for the benefit" of Summer, "and no other."

██ But there was no abdication of legislative or municipal power or function by this undertaking; and none was intended. The governing body agreed to collaborate with the board of liquidation in the service of the general public interest during a period of economic stress; there was no surrender of the municipality's essential governmental power, none whatever; nor could there be. And there can be no doubt that the course thus taken was designed in the utmost good faith to serve the common well-being, and was in no sense motivated by the individual interests of Summer, whose purchase of the lands for the stated purpose was deemed a major service to the community. See *Kozesnik v. Montgomery Township,* 24 *N. J.* 154, 174, 181 (1957). And in the light of the history and long experience and the unique topographical considerations, the delineation of the use districts was in conformity with the constitutional and statutory zoning principle and policy, both as to uniformity of classification and comprehensiveness of plan, although this is not to say that all of the grounds taken would severally sustain all that was done. See *Angermeier v. Borough of Sea Girt,* 27 *N. J.* 298 (1958). But in the essential and motivating considerations, the ordinance conforms to the statutory standard of action. And the master plan is not conclusive on the governing body. See *L.* 1953, *c.* 433, *N. J. S. A.* 40:55–1.13 *et seq.; R. S.* 40:55–35, as amended by *L.* 1948, *c.* 305.

Affirmed.

*For affirmance*—Chief Justice WEINTRAUB, and Justices HEHER, WACHENFELD, BURLING, FRANCIS and PROCTOR—6.

*For reversal*—None.