73 N.J. Super. 562 (1962)
180 A.2d 365
FRANK E. GILMAN AND ELEANOR M. KURES, PLAINTIFFS,
v.
THE CITY OF NEWARK, A MUNICIPAL CORPORATION, MAYOR LEO P. CARLIN, THE COUNCIL OF THE CITY OF NEWARK, AND JOHN ARTHUR, BUILDING INSPECTOR, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided April 6, 1962.
*567 Mr. Walter R. Cohn for plaintiffs.
Mr. Vincent P. Torppey, Corporation Counsel, for defendants (Mr. Jacob M. Goldberg, First Assistant Corporation Counsel, appearing; Mr. Joseph A. Ward, of counsel).
*568 LABRECQUE, J.S.C.
This action in lieu of prerogative writs is instituted by plaintiffs Frank E. Gilman and Eleanor M. Kures against the City of Newark, the mayor and council thereof and John Arthur, the city building inspector. It seeks the invalidation of a certain ordinance adopted on January 4, 1961 regulating and licensing rooming houses in the City of Newark.
The complaint charges that the provisions of the ordinance under attack are unconstitutional and invalid in that:
"(a) Said provisions confer upon the administrative officers therein referred to, unlimited and arbitrary discretion, containing no standards or yardstick by which such authority may be adequately and properly measured.
(b) Said provisions are vague and indefinite, in enabling those effected thereby to determine with reasonable certainty the proper scope thereof.
(c) Said provisions are discriminatory, unreasonable, afford no fair treatment of all persons within the same or comparable category, and are arbitrary, oppressive and capricious.
(d) Said provisions do not give the equal protection of the law to persons with respect to the ownership, operation and maintenance of comparable real estate thereby attempted to be affected.
(e) The classification contained in the said provisions with respect to the property to be thereby effected is artificial, invalid and unreasonable."
It is further urged that the unconstitutional paragraphs are so intimately interwoven and related with the essential and major portions of the ordinance as to be indivisible and inseparable therefrom, and that the entire ordinance is thereby invalid and unconstitutional. The ordinance is likewise asserted to constitute a violation of due process by reason of the alleged failure to provide for notice in the event of a violation.
Initially, it is contended that the ordinance is invalid because of the failure to republish certain amendments thereto. N.J.S.A. 40:49-2 requires that where an ordinance has been advertised for final passage and an amendment is adopted "substantially altering the substance of the ordinance," adoption of the ordinance must be deferred *569 for at least one week and it must be republished at least two days before the time fixed for its final passage as amended. In this case certain amendments to the ordinance were made on the date of the originally advertised public hearing. Plaintiffs urge that the amendments in question were substantial and come within the purview of the statutory requirement. The minutes of the mayor and council show that on the advertised day, after the close of the public hearing, the city clerk called attention to the cited amendments in the following language:
"THE CITY CLERK CALLED ATTENTION TO A NUMBER OF AMENDMENTS TO THE ORDINANCE WHICH WERE BEING MADE BY THE COUNCIL AS A RESULT OF FURTHER STUDY AND RECOMMENDATIONS MADE BY VARIOUS GROUPS OF PEOPLE." (Emphasis added)
The amendments thereupon adopted may be said to:
(a) Permit additional exemptions from the operation of the ordinance as regards rooming houses.
(b) Clarify the meaning of certain provisions with reference to dwellings.
(c) Reduce the requirements with reference to natural ventilation in bathrooms in dwellings.
(d) Eliminate the prohibition against gas burning appliances in sleeping rooms in dwellings so as to permit certain gas appliances to be used.
(e) Extend the time when the provisions of the ordinance as to rooming houses shall go into effect from January 1, 1961 to January 1, 1962.
(f) Extend the time within which application for a rooming house license shall be filed from January 1, 1961 to May 1, 1961.
(g) Reduce the license fee by requiring that application for a rooming house license be accompanied by the fee for one year instead of two years.
(h) Limit the maximum fee for a rooming house license to $50.
*570 (i) Extend the time a rooming house may be operated while application is pending from July 1, 1961 to January 1, 1962.
(j) Reduce the two-year license requirement to a one-year one.
(k) Delete the proviso that rooming house janitors, caretakers, housekeepers, owners, operators, or persons charged with the carrying out of certain provisions of the ordinance shall reside on the premises.
(l) Extend the use of single one-plate gas burners to sleeping rooms.
It can thus be seen that the effect of such of the amendments as affected rooming house operators was to ease the burden imposed by the ordinance upon them in the manner and to the extent indicated.
It is not every amendment that is required to be republished as ordained by N.J.S.A. 40:49-2, but only such as substantially alter the substance of the ordinance. Manning v. Borough of Paramus, 37 N.J. Super. 574 (App. Div. 1955). The inquiry involves a mixed question of law and fact. The words of the amendment are to be assessed in the context of the provision of which they are a part and the basic policy of the legislative enactment. "Substance" in the statutory intendment has reference to the essential elements of the legislative act and the public policy of acts in pari materia. Wollen v. Fort Lee, 27 N.J. 408, 420 (1958).
The amendments in question did not constitute substantial changes altering the substance of the ordinance. Their proposed effects were in the form of additional gratuities rather than additional burdens. Plaintiffs have failed to establish that the amendments were of such legally consequential materiality, in their contributive relation to the substantive body of the ordinance, that their inclusion therein ought to be regarded as a change which essentially altered the manifest objective intent and materiality of the ordinance. Manning v. Borough of Paramus, supra, 37 *571 N.J. Super., at p. 581. The plaintiffs were not aggrieved thereby. Wollen v. Fort Lee, supra, 27 N.J. p. 420. The ordinance was therefore validly adopted.
At the trial some six witnesses were called in addition to plaintiffs. They included a contractor and a tenant called by the latter, the Superintendent of the Inspection Division, the Assistant Health Officer, the Director of the Department of Health and Welfare, and the Chief Inspector of the Bureau of Combustibles and Fire Risks. From the testimony of plaintiff Gilman it appears that the building in which he resides, which is also operated as a rooming house, has been so operated by himself or by others since 1918. No common cooking facilities are furnished. The building is soon to be condemned to make way for a housing project. Plaintiff Mrs. Kures testified she owned and operated two converted dwellings used as rooming houses. She had been operating rooming houses since 1941 when she first converted a dwelling to that use. In one of her buildings, used as a rooming house, there are both back and front stairs so that the cost of compliance with the fire regulations would be higher than usual. Additional testimony bearing upon the contentions of the parties will be referred to infra.
Plaintiffs urge that the ordinance is invalid in that by singling out rooming houses for licensing and regulation, it denies to the proprietors thereof, including plaintiffs, the equal protection of the law. They assert that a rooming house, as defined in the ordinance, differs from a dwelling, as defined therein, only in the number and use of toilets, and that such classification is unreasonable and bears no relation to the object of the ordinance. They also attack that portion of the ordinance which excludes from its purview units occupied by relatives by blood or marriage of the owner or occupier.
A clear reading of the ordinance in the light of common experience is sufficient to establish that rooming houses differ from dwellings in many respects. The absence of individual bathrooms is but one of these. Likewise, the *572 problems presented differ, and thereby justify a different degree of regulation.
The ordinance defines a rooming house as one containing:
"(a) one or more rooming units, occupied by three or more persons, or
(b) three or more rooming units rented or available for rental, providing, however, that persons related to the owner or operator and residing with said owner or operator on the premises within the relationship herein defined, shall not be counted for purposes of this definition. * * *"
"Related persons" are defined in the ordinance as two or more persons who live together in one dwelling unit, maintain a common household, and
"* * * who are related by blood, marriage or adoption, except as hereinafter provided. For the purpose of this ordinance, related persons includes only a husband, and wife, son, son-in-law, daughter, daughter-in-law, brother-in-law, sister-in-law, nephews and nieces, father, father-in-law, mother, mother-in-law, brother and sister, grandparents, grandchild, stepchild, adopted child and bona fide family servants living in and working full time on the premises."
It is asserted that there is no conceivable relationship between this classification and the purported objects of the ordinance, and that all owners or operators of houses where rooms are rented who have related persons residing in the premises should be required to count such persons in arriving at a determination as to whether their premises constitute a rooming house subject to the provisions of the ordinance.
The rule is well settled that a classification for the purpose of licensing will be upheld by the courts unless it is unreasonable, arbitrary or discriminatory. 29 Am. Jur. 30, § 35 (1960). The burden which rests upon one who asserts that a given piece of legislation contravenes the equal protection clause is set forth in Two Guys From Harrison, Inc. v. Furman, 32 N.J. 199, 218 (1960), where the court quoted with approval from N.J. Restaurant *573 Ass'n, Inc. v. Holderman, 24 N.J. 295, 300 (1957), as follows:
"The burden of demonstrating that a statute contravenes the equal protection clause is extremely formidable, as is attested by the long trail of failure. In addition to the strong presumption of constitutionality with which all organic challenges are approached, one who assails a statute on this ground must contend with principles of unusual elasticity. It is easily stated that the classification (1) must not be palpably arbitrary or capricious, and (2) must have a rational basis in relation to the specific objective of the legislation. But the second proposition is qualified by limitations which compound the difficulties of one who assails the legislative decision. Thus it is not enough to demonstrate that the legislative objective might be more fully achieved by another, more expansive classification, for the Legislature may recognize degrees of harm and hit the evil where it is most felt. * * * The Legislature may thus limit its action upon a decision to proceed cautiously, step by step, or because of practical exigencies, including administrative convenience and expense, * * * or because of `some substantial consideration of public policy or convenience or the service of the general welfare.' DeMonaco v. Renton, 18 N.J. 352, 360 (1955). Hence it may `stop short of those cases in which the harm to the few concerned is thought less important than the harm to the public that would ensue if the rule laid down were made mathematically exact.' Dominion Hotel, Inc. v. State of Arizona, supra, (249 U.S. [265] at page 268, 39 S.Ct. [273] at page 274 [63 L.Ed. 597]). * * *"
It went on to hold that in applying the above cited principles, it was necessary to ascertain the evil the Legislature found and then measure against it the reasonableness of the classification.
And in Sarner v. Union Tp., 55 N.J. Super. 523 (Law Div. 1959), it was held:
"It has been said that the courts will not pass judgment upon the wisdom of the Legislature in enacting a law, but will only ascertain if the Legislature has kept within its powers. State v. Garden State Racing Ass'n., 136 N.J.L. 173 (E. & A. 1947). This case also holds that the Legislature has broad powers to classify and, so long as the benefits derived and the burdens imposed bear alike upon every one within the class and the classification can be justified upon any reasonable theory, it cannot be declared a violation of any constitutional provision. But such classification must have some reasonable and just relation either to the general object of the *574 legislation or to some substantial consideration of public policy or convenience or service to the general welfare. Washington National Ins. Co. v. Board of Review, 1 N.J. 545 (1949). It must not be illusory. Arbitrary selection can never be justified by calling it classification. The equal protection required by the Fourteenth Amendment forbids this. Gulf, C. & S.F.R. Co. v. Ellis, 165 U.S. 150, 17 S.Ct. 255, 41 L.Ed. 666 (1897). The court in the Washington National case, supra, 1 N.J., at page 554, pointed out that care must be exercised that the efficacy of constitutional guaranties shall not be whittled away by indulging in unwarranted presumptions of a factual basis for the legislation.
While equal protection does not foreclose reasonable legislative classification, the classification must be non-discriminatory and bear a reasonable relationship to the general object of the legislation."
In Sarner the court invalidated a Sunday closing law, L. 1958, c. 138, N.J.S. 2A:171-5.1 to 5.7, which arbitrarily excluded three counties from its operation. In DeMonaco v. Renton, 18 N.J. 352 (1955), the court set aside the attempted exclusion from the Workmen's Compensation Act of persons engaged in the sale or delivery of newspapers. In that case Chief Justice Vanderbilt held that while the Legislature had broad discretion in selecting those who would be affected by the law, such selection was required to be reasonable and to include all those who naturally fell into the class. In doing so he quoted with approval the following excerpt from Washington National Ins. Co. v. Board of Review, 1 N.J. 545, 553 (1949):
"* * * While the due process and equal protection guaranties are not coterminous in their spheres of protection, equality of right is fundamental in both. Each forbids class legislation arbitrarily discriminatory against some and favoring others in like circumstances. It is essential that the classification itself be reasonable and not arbitrary, and be based upon material and substantial distinctions and differences reasonably related to the subject matter of the legislation or considerations of policy, and that there be uniformity within the class. The equal protection of the laws means that no person or class of persons shall be denied the protection of the laws enjoyed by other persons or classes of persons under similar conditions and circumstances, in their lives, liberty, and property, and in the pursuit of happiness, both as respects privileges conferred and burdens imposed."
*575 In the latter case, which is relied upon by the plaintiffs, certiorari proceedings were instituted to have declared unconstitutional a provision of the Unemployment Compensation Act which exempted from coverage "Service performed by agents of insurance companies, exclusive of industrial life insurance agents, or by agents of investment companies, who are compensated wholly on a commission basis."
But the Washington National case is readily distinguishable from the one sub judice. There, the exemption of persons in the classification named from the provisions of the act bore no reasonable or just relationship to the general object of the legislation or to any substantial consideration of public policy or convenience. The activities of the persons sought to be exempted from coverage came within the ambit of the general objects of the statute, yet they were singled out for special favor over other agents and employees. Such arbitrary selection cannot be justified by designating it as classification. Sarner v. Union Tp., supra, 55 N.J. Super., at p. 533; Gulf, C. & S.F.R. Co. v. Ellis, 165 U.S. 150, 17 S.Ct. 225, 41 L.Ed. 666 (1897).
The question here involved is whether a rational basis exists for the classification set up by the ordinance. As to this, it must be kept in mind that if any state of facts can reasonably be conceived of which would support the tendered classification, the ordinance must be held not to be violative of equal protection. N.J. Restaurant Ass'n, Inc. v. Holderman, supra; Wilson v. City of Long Branch, 27 N.J. 360, 377 (1958); cf. Gundaker Central Motors v. Gassert, 23 N.J. 71 (1956). In determining whether the requisite facts are reasonably conceivable, "* * * a judge may draw upon his general knowledge, yet the further removed a judge's private experience is from the economic scene in which a law is to function, the greater will be his reluctance to conclude that a claimed factual basis is merely fanciful." N.J. Restaurant Ass'n, Inc. v. Holderman, supra, 24 N.J., at pp. 301-302.
*576 The essence of plaintiffs' argument is that the difference between rooming houses and dwelling houses is small; that they both compete for the same patronage, and there exists no state of facts which would justify treating rooming houses separately. But from the testimony it appears that, in certain respects at least, the health hazard is less when families live together in houses or apartments. Likewise, the chance of prompt discovery of fires is generally enhanced where people live together in dwellings and reduced where the premises are occupied by roomers who are generally away during the working hours.
Plaintiffs further contend that if rooming houses are to be separately classified for purposes of licensing and regulation, the elimination of relatives of the owner from consideration in determining the number of occupants, amounts to a deprivation of the equal protection of the laws as to them and others similarly situated. It is true that certain of the evils sought to be corrected by the ordinance are common to all rooming houses, whether occupied by relatives of the owner or not. But it is not necessary for an ordinance to be all-inclusive. A municipal governing body may recognize degrees of harm and proceed to attack them step by step. N.J. Restaurant Ass'n, Inc. v. Holderman, supra; Robson v. Rodriquez, 26 N.J. 517 (1958); Board of Health of Weehawken Tp. in Hudson County v. N.Y. Central R. Co., 4 N.J. 293 (1950). In Brennan v. City of Milwaukee, 265 Wis. 52, 60 N.W.2d 704 (Sup. Ct. 1953), cited by plaintiffs, the court appears to have substituted its judgment for that of the municipality, something which our courts have declined to do.
In the present case, it has not been established that there was no justification for a classification which separately regulates rooming houses and, in defining them, excludes those occupants related to the owner or operator of the unit. As to the criticized definition, ordinances which define operations of the type here involved in terms of the occupant but which exclude those related to the owner or *577 operator are not unknown. An example is found in Pierro v. Baxendale, 20 N.J. 17 (1955), where the zoning ordinance which was upheld by the court contained a provision which defined a rooming house as "any dwelling where furnished rooms are rented to more than six persons for compensation, provided however, the lodging of relatives, by blood or marriage, of the owner or occupant of such dwelling shall not come within these terms."
The plaintiffs have failed to establish that the classification is palpably arbitrary or capricious and that it has no rational basis in relation to the specific objectives of the ordinance. On the contrary, it would appear that the classification in question has reasonable and just relation to the general object sought to be achieved by the ordinance. Sarner v. Union Tp., supra, 55 N.J., at p. 533. To fail to thus exclude related persons in determining the number of roomers would, among other things, discourage children from caring for their parents, and parents from caring for their children. Those having available rooms should be free to make such rooms available to related persons without suffering penalties by being compelled to comply with the requirements of the ordinance in question. In this way, roomers who are related to the proprietor would have the opportunity of retaining some of the advantages of family life.
The relationship between owners and operators of rooming houses and members of their families differs generally from their relationship with the usual run of roomers. Their arrangement may or may not call for compensation. The related owner and operator is in a better position to observe and control the activities of near relatives with reference to the objects sought to be achieved by the ordinance, and to take appropriate and necessary precautions in connection therewith. In addition, the activities of such related occupants relative to the precaution required by the ordinance, are more likely to be in compliance with the wishes of the owner and occupier than the activities of strangers. *578 The proprietors of rooming houses would likewise be expected to receive more assistance and cooperation in the protection of health, welfare and morals from members of their family than from strangers. Thus the occupancy of rooming units by relatives would pose less problems than occupancy by strangers. Likewise, effective enforcement of the provisions of the ordinance would be more difficult where the enforcing officers were dealing with members of a family who would naturally be less inclined to make and prosecute complaints. The classification set up by the ordinance is thus not palpably arbitrary or capricious. N.J. Restaurant Ass'n, Inc. v. Holderman, supra, 24 N.J., at p. 300. Even if its validity be fairly debatable, the legislative judgment should be allowed to control. Clary v. Borough of Eatontown, 41 N.J. Super. 47, 69 (App. Div. 1956); Katobimar Realty Co. v. Webster, 20 N.J. 114, 124 (1955).
It is next contended that certain specific provisions of the ordinance are unreasonable, arbitrary and discriminatory, and thus amount to a denial of due process.
The ordinance in question is entitled:
"AN ORDINANCE RELATING TO HEALTH AND SANITATION CONDITIONS GENERALLY OF BUILDINGS AND PROVIDING ALSO FOR THE REGULATION AND LICENSING OF ROOMING HOUSES; REPEALING THE EXISTING SECTIONS 15.524 TO 15.537 INCLUSIVE, OF ARTICLE XI OF THE REVISED ORDINANCES OF THE CITY OF NEWARK, 1951 AS AMENDED AND SUPPLEMENTED, AND CREATING NEW SECTIONS 15.524 TO 15.537, INCLUSIVE, UNDER ARTICLE XI AFORESAID, IN LIEU OF THE REPEALED SECTIONS."
Its objectives are summarized as:
"* * * to protect the health, safety, welfare and morals of the people of The City of Newark by enacting a housing code which establishes minimum housing standards, determines the respective responsibilities of owners, operators and occupants of dwellings and rooming houses now in existence or that may hereafter be constructed or established and provides for the enforcement of provisions pertaining to such standards and penalties for the violation of such provisions." (Section 15.524.1) *579 A rooming unit is defined as:
"`ROOMING UNIT' shall mean a room or group of rooms forming a single habitable unit, other than a dwelling unit, which is rented or available for rent for sleeping purposes with or without cooking facilities."
A dwelling unit, as distinguished from a rooming unit, is defined as:
"`DWELLING UNIT' shall mean and include any room or group of rooms located within a dwelling and forming a single habitable unit with facilities which are used or designed for living, sleeping, cooking and eating, bathing and toilet purposes." (Section 15.524.2)
Authorization for enactment of the ordinance in question is found in N.J.S.A. 40:52-1, which authorizes municipalities to enact ordinances to "license and regulate":
"d. Hotels, boarding houses, lodging and rooming houses, trailer camps and camp sites, and all other places and buildings used for sleeping and lodging purposes, * * *."
It is asserted that the exercise of the police power in the manner provided in the ordinance constitutes an unreasonable curtailment of the right of the individual plaintiffs to engage in the lawful business of operating a rooming house.
In Lakewood Express Service v. Board of Public Utility Com'rs, 1 N.J. 45, 50 (1948), the test to be applied in determining whether an attempted exercise of the police power contravenes constitutional due process was stated as follows:
"But the exercise of such power is subject to the limitation that it must be reasonable under the conditions and the legislation must have a substantial relation to its object and must not be arbitrary or discriminatory. Wolff Packing Co. v. Court of Industrial Relations, 262 U.S. 522, 535, 43 S.Ct. 630, 67 L.Ed. 1103, Nebbia v. New York, 291 U.S. 502, 535, 54 S.Ct. 505, 78 L.Ed. 940. In other words the legislation must bear a real substantial relation to the public health, safety, morals or some other phase *580 of the public welfare. Thus a regulation which in effect denies or unreasonably curtails the common right to engage in a lawful business cannot be sustained under the Fourteenth Amendment * * *."
In the prior case of N.J. Good Humor, Inc. v. Bradley Beach, 124 N.J.L. 162, 168 (E. & A. 1940), it was held:
"Broad as it is, the police power is not without its limitations. Its exertion must be directed to a legitimate end, i.e., the protection of a basic interest of society rather than the mere advantage of particular individuals. Home B. & L. Ass'n v. Blaisdell, 290 U.S. 398; 54 S.Ct. 231; 78 L.Ed. 413. And it is requisite that the means employed in its exercise have a rational relation to that end, and be altogether free from arbitrariness. The restraints and regulations imposed for the general good and welfare must needs have the virtue of reasonableness. There cannot be in the name of police regulation, an unreasonable and oppressive curtailment of personal or property rights. A measure that goes fairly beyond the public need designed to be served does not take the category of a valid police regulation."
And further:
"And it goes without saying that an exertion of the police power, affecting personal and property rights, is nugatory unless made in good faith for the attainment of a public object within its cognizance. If the dominant purpose be the service of private interests under the cloak of the general public good, it must be adjudged a perversion of the power. The principal is universal that local legislation in the exercise of this power shall be characterized by entire good faith; if this be lacking, it will be struck down by the courts as an abuse of power. As was said in an early Massachusetts case, `the law will not allow the right of property to be invaded, under the guise of a police regulation for the preservation of health, when it is manifest that such is not the object and purpose of the regulation.'" (at p. 169)
In Schmidt v. Board of Adjustment of City of Newark, 9 N.J. 405, 414 (1952), Justice Heher, speaking for a unanimous court held:
"* * * The police authority does not lend itself to expression in terms of a definitive formula that will automatically resolve every case, for its quality and scope are commensurate with the public *581 exigencies arising from ever-changing social and economic conditions. The Fourteenth Amendment in the domain of state action does not operate as a limitation upon the quantum of the power, reasonably exercised. It merely conditions the exertion of the power by the demands of due process. And the guaranty of due process requires `only that the law shall not be unreasonable, arbitrary, or capricious, and that the means selected shall have a real and substantial relation to the object sought to be attained.' Nebbia v. New York, 291 U.S. 502, 54 S.Ct. 505, 510, 78 L.Ed. 940 (1934). The public right of reasonable regulation for the common good and welfare is denominated the police power. Generally, the authority coincides with the public need. As said by Chief Justice Shaw: `It is much easier to perceive and realize the existence and sources of this power than to mark its boundaries, or prescribe limits to its exercise.' Commonwealth v. Alger, 7 Cush. 53, 84 (Sup. Jud. Mass. 1851). The essential content and meaning of the police power and the related constitutional guaranties remain the same; but the application of the power of necessity varies with changing needs and conditions pertaining to the public health, safety, morals, or general welfare. It sanctions measures commensurate with the common material and moral needs; and the correlative restrictions upon individual rights  either of the person or of property  are mere incidents of the social order, considered a negligible loss compared with the benefits accruing to the community as a whole. Indeed, it is to be presumed that a fully compensating individual advantage ensues from the general betterment."
And further:
"The police power has been termed `one of the most essential of powers, at times the most insistent, and always one of the least limitable of the powers of government.'"
Generally the exercise of the police power is contained by the rule of reason which inhibits arbitrary action and requires that there must be a substantial connection between the means invoked and the public interest designed to be advanced. The test has been said to be whether, considering the end in view, the measure "passes the bounds of reason and assumes the character of a merely arbitrary fiat." Id., at p. 416. Reasonableness has been described as a two-sided coin. On one side is the adverse impact of the restriction upon those who assert its unreasonableness: on the other are the social and policy considerations which lead to the adoption of the regulation. The final assessment *582 of reasonableness involves the balancing of these considerations. The more cogent the social pressures impelling the adoption of the restriction, the greater the permissible abrasion of the interest of the individuals affected. Clary v. Borough of Eatontown, supra (41 N.J. Super., at p. 71). While a police regulation that goes beyond the public need is not effective to curtail the basic rights of persons or property which are made the subject of constitutional guaranties, where the subject is comprehended in the police power of the state, debatable questions as to the reasonableness of the measure are not for judicial cognizance. On the contrary, the reasonableness of a municipal ordinance is committed in the first instance to the municipal authorities. Schmidt v. Board of Adjustment of City of Newark, supra (9 N.J., at p. 416); Dennis v. Village of Tonka Bay, 156 F.2d 672, 674 (8 Cir. 1946); Bellington v. Tp. of East Windsor, 32 N.J. Super. 243 (App. Div. 1954), affirmed 17 N.J. 558 (1955). This exercise of legislative judgment is not subject to judicial superintendence unless it is plainly beyond the realm of the police power or is palpably unreasonable. State v. Mundet Cork Corp., 8 N.J. 359, 369 (1952).
A municipal ordinance will be presumed to be reasonable in the absence of proof to the contrary. Ivins v. Trenton, 68 N.J.L. 501 (Sup. Ct. 1902), affirmed 69 N.J.L. 451 (E. & A. 1903). Thus, the burden of proof is upon the plaintiffs to establish the unreasonableness of the ordinance sub judice. Ibid.; Socony Mobil Oil Co. v. Ocean Twp., 56 N.J. Super. 310, 319 (Law Div. 1959), affirmed 59 N.J. Super. 4 (App. Div. 1960); 6 McQuillin, Municipal Corporations (3d ed. 1949), § 20.08; Neumann v. Hoboken, 82 N.J.L. 275, 278 (Sup. Ct. 1912); Del Vecchio v. South Hackensack Twp., 49 N.J. Super. 44 (App. Div. 1958).
It is the plaintiffs' contention that the ordinance in question has for its object and purpose the elimination of rooming houses altogether and that this denies to them the right to engage in a legitimate business, citing Watchung *583 Lake, Inc., v. Mobus, 119 N.J.L. 272 (Sup. Ct. 1938), and Messina v. Mayor and Council, etc., of Lodi, 18 N.J. Super. 503 (App. Div. 1952). They refer particularly to what they characterize as the unreasonably stringent requirements of the fire prevention and cooking provisions of the ordinance, which, they assert, will have the effect of forcing many rooming house owners and operators out of business.
The fire prevention section of the ordinance contains some nine subsections. The four sections complained of are as follows:

"Section 15.531.5

FIRE PREVENTION PROVISION.

* * * * * * * *

(f) Smoking in Bed Prohibited.

Smoking in bed is prohibited. Each bedroom in a rooming house shall have a sign conspicuously displayed reading `Smoking in bed prohibited.'

(g) Doors To Be Self-closing.

All doors leading from rooming units in a rooming house to the common hallway or other common area shall be equipped with self-closing devices in operating condition.

(h) Fire Alarm System.

Every rooming house shall be equipped with a fire alarm system of a type approved by the Director of the Fire Department and so installed as to detect fire in any part of the premises and give automatic warning of fire. Warning sounding devices shall be so located that a warning sound of sufficient loudness will reach all occupied dwelling units and rooming units in the premises.

(i) Fire Prevention Provision.

Any premise utilized as a rooming house with rooming units above the ground floor level shall have fire resistant partitions enclosing each common hallway or areaway above the ground floor level and also self-closing fire doors leading from each level to the stairwell. All partitions and doors of said hallways and areaways on all floor levels shall have a minimum fire rating of one hour. Stairs leading from the cellar or basement up to the first floor shall be enclosed with masonry walls no less than 8" in thickness and shall have self-closing fire proof doors at the top and the bottom of the stairs."
Since the provisions in question have a substantial relation to the asserted objects of the ordinance, they must *584 be upheld unless it has been established that they are unreasonable, arbitrary or discriminatory. Precautions against fire are in the interest of public safety and health and where reasonable should be upheld. Smoking in bed has been found to be a frequent cause of night fires. The provision requiring a rooming house owner to post a sign reading "smoking in bed prohibited" is reasonably calculated to reduce the risk of fire from this source and imposes no unreasonable burden upon proprietors of rooming houses.
The provision requiring the installation of a fire alarm system capable of detecting fires in any part of the premises and of giving automatic warning thereof, is likewise reasonable and represents a proper exercise of the police power. Such fire alarm systems are not unusual. They are found in business and industrial establishments, hotels and public buildings. They may be, and are not infrequently, installed in private homes. An even more elaborate system is required in the case of hotels. N.J.S.A. 29:1-25 and 26. While the record is devoid of evidence as to the cost of installation of such an alarm system, and no charge is made that such cost would be unreasonable or impossible of fulfillment, it is urged that this section of the ordinance is invalid because of lack of standards to control its enforcement. A clear reading of the section demonstrates the lack of justification for this criticism. The fire alarm system is to be installed so as to (1) detect fire in any part of the premises, and (2) give automatic warning of the fire by a device of sufficient loudness to reach all occupied dwelling units and rooming units in the premises. It appears from the uncontradicted testimony that fire alarm systems of various makes and types, which meet the tests cited, are readily available. Since any one of these systems having the approval of the Underwriters Laboratories could qualify, further specificity was not required.
It is urged that the provisions of subsections (g) and (i), while perhaps having some relation to the objects sought *585 to be achieved by the ordinance, i.e., fire protection, are nevertheless arbitrary and unreasonable. But plaintiffs have wholly failed to establish the arbitrariness or unreasonableness of subsection (g) which requires self-closing doors. The cost of compliance is not shown to be unreasonable and its relation to the prevention or control of fires can hardly be denied.
In support of plaintiffs' claim that subsection (i) of the ordinance is invalid, evidence was adduced indicating that the cost of making the necessary changes to comply with the ordinance in a rooming house operated by one of plaintiffs would be $1,609.75; that in another such rooming house which contained two such stairways the total cost would be $3,074.60. The mere fact that plaintiffs would undergo pecuniary expense if the ordinance is enforced, standing alone, does not render it invalid. 6 McQuillin, Municipal Corporations, § 20.09; Dennis v. Village of Tonka Bay, supra. Proof, at least, of the value of plaintiffs' premises, of which none was produced here, is a basic requisite to determination of the reasonableness of the provisions referred to. But beyond that, consideration of the purpose for which they were enacted is of primary importance. The testimony indicates that they were based upon recommendations of a committee of the Board of Engineers of the Fire Department of the City of Newark and were calculated to curtail the spread of fires caused by open stairwells. The provisions in question are reasonably calculated to serve this end. Photographs received in evidence on the part of the city demonstrate the manner in which fires tend to spread through non-fireproof buildings, particularly through open stairways and hallways. Many rooming houses consist of old converted dwellings and are not fireproof. With respect to the detection and control of fires they lack "round-the-clock" services of watchmen and other employees which hotels enjoy. They likewise lack the close association and supervision enjoyed by families residing in dwellings. Both of the latter are *586 in a better position to detect fires when they occur and to minimize their effects. Through the fireproofing required by the ordinance, fires starting in rooms, whether due to smoking in bed or otherwise, would be more easily confined, and were they to extend beyond the individual rooming units, would be prevented from spreading to other units via the stairwells or hallways.
Viewed in this light, the provisions in question do not appear to be unreasonable or arbitrary. From the evidence adduced it appears that some 800 applications for rooming house licenses had been received by the city up until the time of the hearing. Based upon O.P.A. data compiled in 1942, the number of rooming houses in the City of Newark was estimated to exceed 3000. The record is devoid of evidence that the average rooming house operator could not meet the expense of compliance with the provisions in question, or that such expense would preclude the continued operation of such businesses. On the contrary, the improvements in question would undoubtedly render the premises more desirable from a safety standpoint. The probability that this might mean added income to rooming house owners, while not certain, is not to be discounted.
With respect to cooking facilities, the ordinance provides:

"Section 15.531.6

COOKING AND EATING FACILITIES IN ROOMING HOUSES.
(a) No community or common cooking and eating facility shall be allowed, except that cooking and eating facilities in boarding houses shall be permitted where the operator, or his agents, servants or employees is in charge of the cooking and dining facilities and prepares and serves the food to guests.
(b) Cooking and eating facilities in rooms shall be permitted only upon compliance with the following conditions:
(1) Cooking facilities in sleeping rooms shall: (a) Be limited to electrical appliances * * * and to a single one-plate gas burner which is permanently connected by rigid pipe to the source of gas supply in accordance with the plumbing code of the City of Newark.

* * * * * * * *
(2) Cooking facilities in rooms other than sleeping rooms shall be permitted in rooming units provided that all of the facilities *587 as required under subsection 15.525.4 and facilities for refrigeration and storage of food in a sanitary manner and an enclosed washable permanent container for disposal of refuse are contained as part of and adjacent to said cooking facilities.

* * * * * * * *"
The provisions referable to one-plate gas burners are said to be arbitrary and discriminatory in that they are at variance with a provision of the Tenement House Act (N.J.S.A. 55:1-24). The contention of the plaintiffs may be summed in the following excerpt from counsel's oral argument:
"The State Tenement House Statute from 1904 to 1959 stated that if there were more than two persons living on the premises, cooking independent of one another, it is a tenement house. In 1959 the amendment was added to allow three as long as a third did not have a full cooking unit. The Tenement House Board has for the last four years attempted to say that all rooming houses with one-plate burners are tenement houses and that if you have more than three cooking units you are a tenement house, and of course the rooming houses cannot comply because the first requirement of a tenement house is that each house must have a private toilet.
So the state says that you cannot have one-plate burners, you can only have a community kitchen, the community kitchen by definition being more than one person using it. The city ordinance specifically outlaws community kitchens and says you can only have one-plate burners. The net result is no cooking units in these rooming houses. * * *"
R.S. 55:1-24 was amended by chapter 12 of the Laws of 1959, and later by chapter 84 of the Laws of 1961, the latter being effective June 26, 1961. The 1959 amendment withheld from the definition of a tenement house a unit for occupancy by three families living independently, where the space provided for at least one of such families was not equipped with full cooking facilities, with certain provisos not here relevant.
It is represented to the court by plaintiffs that the Tenement House Board has been attempting to classify all rooming houses with one-plate burners as tenement houses. We are not here concerned with the enforcement of the Tenement House Act or with what would be the result if roomers *588 availed themselves of the privilege allowed by the ordinance, i.e., the use of one-burner gas cooking units. The statute defines as a tenement house any building or portion thereof occupied as a home or residence of three families or more living independently of each other and doing their cooking upon the premises. As cited above, an exception is made in the case of a detached dwelling not more than three stories high having central heating equipped for occupancy by three families, where one of such families is not equipped with full cooking facilities and the dwelling house has not been constructed or converted on or after September 1, 1959. Any cooking facilities designed for the use of the occupants of a unit, qualify the unit as a tenement house, provided three or more families are the occupants and are living independently of each other and doing their cooking upon the premises. Thus, the asserted conflict with the Tenement House Act would probably exist in any case unless the ordinance prohibited cooking altogether in rooming units. The effect of the provision in question was to lighten the load and to render less likely the possibility of such a conflict. The ordinance does not require the use of one-plate burners, it merely permits them. The Tenement House Act does not prohibit the use of such burners, but likewise permits them  although in certain cases their use may lead to the classification of the building as a tenement house. All of this assumes, of course, that the cooking unit is located in the sleeping room and that it is a single one-plate gas burner. The ordinance contains no prohibition of electrical cooking appliances in sleeping rooms and places no restriction whatever on cooking facilities in rooms other than sleeping rooms in rooming units, where a kitchen sink and adequate ventilation are furnished and proper provision has been made for refrigeration, food storage and disposal of refuse.
Subsection (a) of § 15.531.6, which is also under attack, prohibits community or common cooking and eating facilities except in boarding houses, etc. It bears a substantial relation to the objectives of the ordinance and, since the *589 plaintiffs have not established that it is unreasonable or arbitrary, it must be sustained. Lakewood Express Service v. Board of Public Utility Com'rs, supra, 1 N.J., at p. 250. The furnishing of common or community kitchen facilities would introduce into the rooming house business additional problems of health, safety and sanitation, to say the least. These would include the difficulty of enforcing cleanliness and of controlling or supervising the users of such facilities, the divided responsibility which the community kitchen entails, and the added opportunities for the communication of disease, to mention but a few.
The next attack is upon the provisions of the ordinance prohibiting the occupancy of rooming houses by minors except in certain specified instances. It is urged that plaintiffs are precluded from renting lodgings for the use of infants and that their ability to derive income from their business is thus being restricted without due process. Section 15.531.4 of the ordinance provides that:
"No minors shall be permitted to occupy any rooming unit in any rooming house except minors over the age of 18 years, emancipated minors, or minors registered in and attending an accredited college or institution of higher learning."
As to this provision plaintiffs first urge that it is invalid by reason of the fact that it is in direct conflict with the provisions of N.J.S. 2A:170-92 which provides as follows:
"Any person, firm or corporation or any agent, officer or employee thereof who:
a. Refuses to rent or lease any house or apartment to another person because his family includes children under 14 years of age; or
b. Makes an agreement, rental or lease of any house or apartment which provides that the agreement, rental or lease shall be rendered null and void upon the birth of a child 
Is a disorderly person."
It is well settled that a municipality may not enact an ordinance which is in conflict with an applicable statute of this *590 State. R.S. 40:48-2; Fred v. Mayor and Council, etc., Old Tappan, 10 N.J. 515, 521 (1952); Magnolia Development Co., Inc. v. Coles, 10 N.J. 223 (1952); Hertz Washmobile System v. South Orange, 41 N.J. Super. 110, 123 (Law Div. 1956), affirmed 25 N.J. 207 (1957). The defendants urge, however, that the cited section refers only to the rental of houses or apartments and has no application to rooming houses. No case in which the statute in question has been applied to rooming houses has been cited by the plaintiffs. It was not intended to so apply.
In determining the validity of this provision, we turn first to the consideration of the object sought to be accomplished by the exclusion of children from rooming houses unless they be over 18 or emancipated or attending college. Mr. Nugent, the city health officer, when called as a witness was unable to shed any light on the reason for the provision from a health standpoint. It is difficult to conceive how excluding children under 18 and permitting those over that age constituted any contribution to the health of the occupants of a rooming house. The fact that emancipated minors and college students were likewise permitted, only adds to the confusion as to the object of the provision.
One of the well known causes of fires is smoking. From the standpoint of fire prevention, it would seem that emancipated minors, college students and those over 18 years of age, would be more likely to be smokers than children under 18. Or if the objects of the provision were to curtail or prevent immorality, it is again difficult to understand the exception in favor of those over 18, or those emancipated, or those attending college. Assuming, arguendo, that the provision in question had a substantial relation to the objects sought to be accomplished by the ordinance, we must balance the objects sought to be accomplished against the inconvenience which would be inflicted upon those whom the ordinance seeks to regulate. Clary v. Borough of Eatontown, supra, 41 N.J. Super., at p. 71. The effect of the ordinance is to effectively exclude from rooming houses all *591 preschool, elementary school or high school students. These are excluded regardless of whether they are living alone or living with parents or guardians.
The court is satisfied that there are many heads of families, particularly mothers, to whom a rooming house is a distinct boon. Whether by reason of the fact that the support granted to the mother is limited or by reason of the fact that she is compelled to work in order to support her family, she is unable to afford the more expensive accommodations represented by dwellings, apartments or hotels. The effect of the provision in question would be to separate such families. But it is in the public interest that families be kept together and that children in their growing and adolescent years have the companionship and guidance of their parents. N.J.S. 2A:170-92, while not binding here, is nevertheless indicative of the tendency of public policy to favor equality of housing as between the childless and those having children in their families. The natural instinct of parents is to refuse separation from their children. The enforcement of the ordinance would thus not only deprive rooming house proprietors of the income from the children who would be precluded from using their facilities, but they would likewise be deprived of the income from parents of such children who would be disinclined to abandon their children, and would thus be forced to secure other living quarters by reason thereof. The court concludes that the provision precluding the occupancy of rooming houses by minors 18 years of age or under who are not emancipated or students attending college, is unreasonable and arbitrary and therefore invalid.
We next turn to consideration of the plaintiffs' contention that the ordinance fails to provide adequate and specific norms and standards for the guidance of licensing officials in making determinations as to the issuance, renewal or denial of licenses. They particularly indicate § 15.530.4 and § 15.530.5 as examples of what they characterize as the absence of such standards.
*592 Section 15.530.4 provides for the submission of applications for the operation of rooming houses by the supervisor of licenses to the secretary of the board of adjustment for approval as to the applicability of the city zoning ordinance to the premises involved. If he determines "* * * that the premises are located in a zone wherein rooming houses are not permitted or that rooming house use of the premises in such zone is not a lawful non-conforming use * * *" he is required to "* * * so note * * *" on the application and to "* * * return the application to the Supervisor who shall thereupon deny and return the application together with the license fee paid therewith to the applicant, and no license shall issue in such case * * *" If it is determined that the premises are located in a zone where the operation of a rooming house is permitted, or if the use of the premises as a rooming house is a lawful nonconforming use, he is required to so note on the application and thereupon the Director of the Department of Health is to secure from the Director of Police a certification as to the state of the police records regarding convictions of crime on the part of each applicant. In the event that conviction of a crime involving moral turpitude is thereby revealed and such conviction has not been expunged by a court of competent jurisdiction, the director is to recommend to the supervisor that the application be denied and no license issued thereon. In the event that there is no such criminal record, the director is to cause the premises to be inspected for compliance with the provisions of the housing code. If after such inspection, the director determines that the premises so comply, he is to recommend the issuance of a license and the supervisor is directed to issue it. If, on the other hand, the director determines that the premises are in violation of the code, he must forthwith send a copy of the ascertained violations by registered or certified mail to the applicant. The applicant has five days within which to request the director to hold a hearing on the alleged violations. If a hearing is requested, *593 the director must hold the hearing within 25 days, upon ten days' notice to the applicant by registered or certified mail. At the hearing the director is authorized to prescribe reasonable terms, conditions or provisions for the abatement or correction of the violations reported by the inspection. Upon the abatement or correction of the violations, the director is to reinspect the premises, and if the violations have not been abated or corrected, he is to recommend to the supervisor that the application be denied and that no license be issued thereon. If, on the other hand, the applicant has abated or corrected the violation, he is to recommend, and the supervisor is to issue, the license. The director is required to forthwith forward copies of all of his recommendations to the supervisor, the director of police and the secretary of the board of adjustment, and to send a copy thereof by registered or certified mail to the applicant. If the recommendation is to deny the application, he is required to set forth the specific reasons therefor.
In dealing with the question of standards the court is not confined to the specific terms of any one section of the ordinance, but must examine the entire ordinance, keeping in mind its objectives in the light of the surrounding circumstances. Ward v. Scott, 11 N.J. 117 (1952); Greggio v. Orange, 69 N.J. Super. 453, 461 (Law Div. 1961).
It would appear from a reading of the above summary that adequate and specific norms and standards have been set up to guide the administrative officers of the city in granting licenses for the operation of rooming houses. The ordinance is so specific in its various sections as to leave very little discretion either to the director or the supervisor, the officers primarily charged with the issuance of licenses. It is contended by plaintiffs that the provision which authorizes the director to "* * * prescribe reasonable terms, conditions or provisions for the abatement or correction of the violations reported by the inspection," is *594 devoid of any standards. On the contrary, the word "reasonable" is the standard to be used. It is difficult to see how a more detailed standard could be used, since there would be no way of knowing in advance what the violations would be. Some discretion must be vested in the officer charged with the duty of enforcement, and the rule of reasonableness in the light of the objectives of the ordinance and the grounds laid down, is the standard by which his authority is bridled. State v. Wheeler Auto Driving School, Inc., 17 N.J. Super. 488, 495 (App. Div. 1952); see City of Newark v. N.J. Turnpike Authority, 7 N.J. 377, 385 (1951).
We next turn to the plaintiffs' criticism of § 15.530.5, which concerns the procedure for renewal of licenses or for revocation or suspension thereof. This section provides that "If, during the term of any license or upon the filing of an application for renewal, * * * the Director shall determine that the licensee or applicant * * * was convicted of a crime involving moral turpitude * * *," he "* * * shall recommend to the Supervisor that the license be revoked or that the renewal application be denied, as the case may be." And further, "If during the term of any license or upon the filing of an application for renewal, * * * the Director shall ascertain that there are violations of this code or of any applicable codes or ordinances of the City of Newark, or that the licensee or applicant, * * * was convicted of an offense which reflects adversely on the operation or manner of operations or conduct of the rooming house * * *," the director is required to forthwith send a copy of the ascertained violations and convictions by registered or certified mail to the licensee or applicant. He, in turn, may request a hearing on the alleged violations or convictions within five days, whereupon the director is required to hold such hearing within 25 days upon ten days' notice to the applicant by registered or certified mail. At the hearing the director "* * * shall prescribe reasonable terms, conditions or *595 provisions for the abatement or correction of the conditions caused by the violations or convictions." Upon such abatement or correction the director is to reinspect the premises and, if the applicant has abated or corrected the condition caused by violations or convictions, to recommend approval of the renewal of the license, or the continuance of the license, as the case may be. If the conditions have not been abated or corrected, he is to recommend to the supervisor that the license be revoked or temporarily suspended, or that the renewal application be denied. In the event of a finding adverse to the applicant, the specific reasons therefor are required to be embodied in his recommendation.
Section 15.530.6 provides for a further appeal by the applicant. If the director recommends to the supervisor of licenses the denial of an application for a license, or that a license be revoked or temporarily suspended, or that the renewal thereof be denied, the supervisor is required to act in accordance with such recommendation unless the applicant files a notice of appeal in the office of the supervisor. Thereupon the business administrator or his designee is required to hold a hearing within 25 days after the filing of a notice of appeal upon ten days' notice to the appellant. At the conclusion of the hearing the business administrator is required to make a determination on the merits of the appeal. The supervisor of licenses is then directed to take such action as conforms with the determination made. If, however, the business administrator at the hearing prescribes terms, conditions or provisions for the abatement or correction of any violations by the applicant, the hearing is required to be continued to permit compliance therewith, by the applicant. If a reinspection reveals abatement or correction of the violations found, eventual granting of the license is provided for.
The provisions in question provide for the revocation of a license or the refusal of a renewal thereof if the licensee or applicant has been convicted of a crime involving "moral turpitude." A similar standard has been prescribed in other *596 statutes. N.J.S.A. 33:1-25; R.S. 45:10-9; N.J.S.A. 45:14-12; N.J.S.A. 45:7-62(h); N.J.S.A. 45:19-16(d).
The court deems it to be a sufficient guide to the authorities charged with the issuance or renewal of licenses. Cf. Berardi v. Rutter, 42 N.J. Super. 39 (App. Div. 1956), affirmed 23 N.J. 485 (1957). The mere fact that the standards set forth are general rather than specific does not militate against their acceptance and validity. The exigencies of modern government have increasingly dictated the use of general rather than minutely detailed standards in regulatory enactments under the police power. Ward v. Scott, supra, 11 N.J., pp. 123-124; Greggio v. Orange, supra, 69 N.J. Super., pp. 461-462; cf. Berardi v. Rutter, supra; N.J. Bell Telephone Co. v. Communications Workers, etc., 5 N.J. 354, 371 (1950); In re Greenville Bus Co., 17 N.J. 131, 135 (1954); State v. Hotel Bar Foods, 18 N.J. 115, 124 (1955). Professor Davis, after a survey of many cases, including some from New Jersey, reached the conclusion that standards are not as important as procedural safeguards and outside checks upon discretionary power. 1 Davis, Administrative Law, §§ 2.08-2.15 (1958). Here procedural safeguards are not lacking. In the event of procedural unfairness, the courts are available.
Nor does the provision which provides for revocation, temporary suspension or refusal to renew for failure to abate or correct conditions caused by conviction of "an offense which reflects adversely on the operation or manner of operations or conduct of the rooming house," invalidate this section. Plaintiffs argue that the ordinance should have spelled out with greater particularity the actual offenses which the municipal body had in contemplation. To set forth in detail each and every offense, the conviction of which would reflect adversely on the operation of a rooming house, would be an extremely difficult task. Assuming, arguendo, that further specificity could have been attained, a clear reading of the provision in question in the context *597 of the entire ordinance, especially those portions having to do with the enforcement thereof, leads to the conclusion that adequate standards are not wanting. While the words used may not have the exactness of a mathematical formula, when interpreted with reason and good judgment, there is developed a direction sufficiently precise and clear to permit intelligent understanding and enforcement. Adams Newark Theatre Co. v. City of Newark, 22 N.J. 472, 479 (1956), affirmed 354 U.S. 931, 77 S.Ct. 1395, 1 L.Ed.2d 1533 (1957). The provision cited refers to conditions caused by or resulting from convictions for "offenses," as distinguished from crimes involving moral turpitude. It refers to such offenses as reflect upon the operation of the rooming house as distinguished from those which are entirely disconnected therefrom. The convictions referred to must be related to conditions which are capable of abatement or correction and the terms imposed for such abatement or correction are required to be reasonable.
Plaintiffs also urge that the failure of the ordinance to provide for notice of and a hearing on violations as a prerequisite to prosecution in all cases, renders the ordinance invalid. § 15.534(a) provides, with certain exceptions, for the giving of notice of violations of the housing code by the director. The exceptions are contained in subsection (b) as follows:

"REQUIREMENT OF NOTICE OF VIOLATION OF CODE.

* * * * * * * *

(b) Notice Not Necessary In Certain Cases.

For the enforcement of subsections 15.525.2(e), 15.525.3(c), 15.525.7(h), 15.525.9, 15.526(i), 15.526(j), 15.528(d), 15.530, 15.531.1(c), 15.531.3(a, b and c), 15.531.5(f) and 15.531.6 of this Housing Code, it shall not be necessary for the Director to first give notice of the violation or to first comply with Section 15.27 of the Revised Ordinances, 1951, or subsection 15.534(a) of this Housing Code before instituting proceedings in the Municipal Court for a penalty for violation of any of these sections, or subsections."
Plaintiffs cite no authority which supports their contention. The violations referred to in subsection (b) are *598 violations which would generally call for prompt correction rather than notice and hearing. Thus, of the first four, § 15.525.2(e) covers minimum heat requirements; § 15.525.3(c) provides for the furnishing of hot water; § 15.525.7(h) restricts gas appliances in sleeping rooms; and § 15.525.9 precludes the shutting off or discontinuance of services or utilities. In the case of each of the cited exceptions it would be difficult to conceive of a situation in which the licensee or his agent would be unaware of the violation. In the case of many of them delay in prosecution would defeat one of the very purposes for which the ordinance was enacted. The provision in question is valid.
Plaintiffs' final attack is directed against the provision of the ordinance which reads as follows:

"Section 15.536. ORDINANCE TO ACT RETROACTIVELY.
This ordinance shall be construed to operate retroactively as well as prospectively."
While retrospective laws are generally deemed unjust and oppressive, the Constitution of the United States does not in terms prohibit the enactment by a state or its subdivision, of such laws unless they partake of the character of ex post facto laws, impair the obligation of contracts or divest vested rights. 11 Am. Jur., Constitutional Law, § 365 (1937). Nor does our own Constitution, in terms, forbid them. Pennsylvania Greyhound Lines, Inc. v. Rosenthal, 14 N.J. 372, 384 (1954).
Thus the ordinance, if construed as imposing a criminal penalty for conditions which carried no criminal implications prior to its effective date, would be invalid.
But it is not required that it be so construed. Municipal ordinances are to be construed in the same manner as statutes. Guill v. Mayor and Council of City of Hoboken, 21 N.J. 574 (1956). Where there are two possible interpretations of a statute or ordinance, the one which will uphold the law is to be adopted in preference *599 to the one under which the law would be unconstitutional. Adams Newark Theatre Co. v. City of Newark, supra (22 N.J., at p. 478); State v. Sutton, 87 N.J.L. 192 (E. & A. 1915). The city disclaims any intention that the ordinance be enforced retrospectively in the sense indicated above. On the contrary, it asserts that what is sought to be achieved is compliance with the ordinance by all buildings used as rooming houses regardless of whether they were constructed before or after its enactment. In this sense no constitutional bar exists. The ordinance involves no impairment of the obligation of contracts or violation of due process through interference with or alteration of a vested property right, or legal remedy that antecedently existed. Den ex dem Berdan v. Van Riper, 16 N.J.L. 7, 11 (Sup. Ct. 1837); State, Bonney v. Reed, Collector of Bridgewater, 31 N.J.L. 133, 135 (Sup. Ct. 1864); Deegan v. Morrow, 31 N.J.L. 136 (Sup. Ct. 1864); Baldwin v. City of Newark, 38 N.J.L. 158 (Sup. Ct. 1875); United New Jersey R.R., etc., Co. v. National Docks, etc., Co., 54 N.J.L. 180, 194 (E. & A. 1891); Presbytery of Jersey City v. Trustees of First Presbyterian Church, 80 N.J.L. 572, 577 (Sup. Ct. 1910); Fidelity Union Trust Co. v. Price, 18 N.J. Super. 578, 590 (Ch. Div. 1952), affirmed in part and reversed in part in 11 N.J. 90 (1952).
The plaintiffs had acquired no vested right to continue to operate their premises as rooming houses. Under N.J.S.A. 40:52-1(d) the business of conducting a rooming house is specifically subjected to municipal regulation. Such regulation includes the exercise of the police power by the municipality. Legislative enactments pursuant to such power are valid even though they curtail or restrict the use of private property. Monmouth Lumber Co. v. Ocean Township, 9 N.J. 64, 71 (1952). As was said in Welsh v. Morristown, 98 N.J.L. 630, 634 (Sup. Ct. 1923), affirmed Welsh v. Potts, 99 N.J.L. 528 (E. & A. 1924):
"* * * Every citizen holds his property subject to the proper exercise of this [police] power, either by the Legislature directly *600 or by public or municipal corporations to which the Legislature may delegate it. It is well settled that laws and regulations of this character, relating to the comfort, health, convenience, good order, and general welfare of the inhabitants, though they may disturb the enjoyment of individual rights, are not unconstitutional, though no provision is made for compensation for such disturbances. They do not appropriate private property for public use, but simply regulate its use and enjoyment by the owner. If he suffers injury, it is either damnum absque injuria, or, in theory of the law, he is compensated for it by his sharing the general benefits which the regulations are intended and calculated to secure. Dillon's Mun. Corp. 5th Ed. 555, § 301. Munn v. Illinois, 94 U.S. 113, 24 L.Ed. 77." (Emphasis added)
Plaintiffs thus held their property subject to appropriate municipal regulation in the field of health, safety, welfare and morals. Chicago & Alton R. Co. v. Tranbarger, 238 U.S. 67, 77, 35 S.Ct. 678, 59 L.Ed. 1204 (1915). They did not acquire immunity from the exercise of the police power because prior to the enactment of the ordinance, their property was in conformity with the then applicable ordinances. Queenside Hills Realty Co., Inc. v. Saxl, 328 U.S. 80, 66 S.Ct. 850, 90 L.Ed. 1096 (1946); Paquette v. City of Fall River, 338 Mass. 368, 155 N.E.2d 775 (Sup. Jud. Ct. 1959); cf. Prinz v. Paramus, 120 N.J.L. 72 (Sup. Ct. 1938), affirmed 121 N.J.L. 585 (E. & A. 1939); see also annotation in 109 A.L.R. 1117. It follows that the provisions of the ordinance should be construed to apply to all rooming houses operated after the effective date of the ordinance, regardless of whether they had been in operation prior thereto.
It remains to be determined whether the invalidity of § 15.531.4 renders the entire ordinance invalid. The rule is well settled that where all of the sections of a municipal ordinance are so intimately related as to form an integrated whole, the fact that one or more of its provisions are held to be illegal and unconstitutional renders the entire ordinance invalid. Tagmire v. Atlantic City, 35 N.J. Super. 11 (App. Div. 1955). On the contrary, where the provisions of an ordinance are separable, the invalidity of *601 one of the separate parts does not render the entire ordinance invalid provided the remainder contains the essentials of a complete enactment. In such cases, the invalid part is to be rejected and the remainder allowed to stand as valid and operative. Schait v. Senior, 97 N.J.L. 390, 393 (Sup. Ct. 1922); Prinz v. Paramus, supra, at p. 74; Romar Realty Co. v. Haddonfield, 96 N.J.L. 117 (Sup. Ct. 1921); St. John The Baptist, etc., Church v. Gengor, 121 N.J. Eq. 349, 357 (E. & A. 1937); Kennedy v. City of Newark, 29 N.J. 178 (1959).
In the case sub judice, § 15.531.4, the invalidity of which has been established, is not so intimately tied in with the remaining provisions of the ordinance as to require its entire invalidation. It can be readily exscinded from the ordinance without impairing the efficacy of the remaining provisions. Blake v. Pleasantville, 87 N.J.L. 426, 430 (Sup. Ct. 1915). They contain the essentials of a complete integrated enactment independent of the invalid section. Brundage v. Randolph Tp., 54 N.J. Super. 384, 395 (App. Div. 1959), affirmed 30 N.J. 555 (1959).
The independence of the respective parts indicates a legislative intention that the constitutional insufficiency of one part would not render the remainder inoperative. Washington National Ins. Co. v. Board of Review, supra, 1 N.J., at p. 556. This legislative intention is confirmed by the severability clause (§ 15.537) which reads as follows:

"Section 15.537. SEVERABILITY.
If any section, subsection, paragraph, sentence, clause or phrase of this ordinance should be declared invalid for any reason whatsoever, such decision shall not affect the remaining portions of this ordinance which shall remain in full force and effect; and to this end the provisions of this ordinance are hereby declared to be severable."
Angermeier v. Sea Girt, 27 N.J. 298, 311 (1958); Yanow v. Seven Oaks Park, Inc., 11 N.J. 341, 360-361 (1953); 11 Am. Jur., Constitutional Law, 846, § 156.
*602 For the reasons stated, the court finds § 15.531.4 of the ordinance to be unconstitutional and invalid. The remaining provisions of the ordinance are found to be valid and enforceable. An order for judgment in conformity with these findings may be submitted.