WALTER B. FRED, ET ALS., PLAINTIFFS-APPELLANTS, v. MAYOR AND COUNCIL OF THE BOROUGH OF OLD TAPPAN, DEFENDANT-RESPONDENT.

Argued October 14, 1952—Decided November 17, 1952.

Mr. *James A. Major* argued the cause for the appellants (*Messrs. Major & Carlsen,* attorneys).

Mr. *Walter H. Jones* argued the cause for the respondent.

The opinion of the court was delivered by

VANDERBILT, C. J.   The plaintiff landowners instituted this action in the Law Division of the Superior Court to test the validity of an ordinance of the defendant borough regulating the removal of soil from lands within its confines. From the judgment of that court sustaining the ordinance the plaintiffs took an appeal to the Appellate Division of the Superior Court which we have certified here on our own motion.

Two questions are presented on this appeal: does a municipality have the authority to enact an ordinance regulating the removal of soil, and if so, does the ordinance here under attack come within the limits of that authority?  We shall address ourselves to these two questions in the order posed.

## I.

The defendant contends that the authority to pass such an ordinance is conferred on it by *Article IV, Section*

*VII, paragraph* 11, of the *Constitution of* 1947 which provides:

"The provisions of this Constitution and of any law concerning municipal corporations formed for local government, or concerning counties, shall be liberally construed in their favor. The powers of counties and such municipal corporations shall include not only those granted in express terms but also those of necessary or fair implication, or incident to the powers expressly conferred, or essential thereto, and not inconsistent with or prohibited by this Constitution or by law."

It is urged upon us that this clause of the Constitution of 1947, which had no counterpart in its predecessor constitution, introduced a new concept of home rule into the law of this State, being, in effect, a direct grant of the police power to all municipalities. In support of its position the defendant refers us to certain of the proceedings of the Constitutional Convention of 1947, I *Convention Proceedings Record,* 400–403, 449, 450, 763. We find no merit to this contention of the defendant. The quoted provision of the Constitution on its face does not purport to be a grant of general police powers to all municipalities, its plain language is not susceptible of being so construed, the proceedings of the Constitutional Convention referred to do not indicate that it was so intended, and during the five years since its adoption our courts have never so interpreted it. On the contrary, it is well settled in this State that a municipality has only those powers granted to it by statute, albeit by virtue of the constitutional provision here under discussion those powers are to be liberally construed in favor of the municipality and express grants of power are to be deemed to include "those of necessary or fair implication, or incident to the powers expressly conferred, or essential thereto." *Magnolia Development Co. Inc. v. Coles,* 10 *N. J.* 223, 227 (1952); *State v. Mundet Cork Corp.,* 8 *N. J.* 359, 370 (1952); *Borough of Jamesburg v. Hubbs,* 6 *N. J.* 578, 584 (1951); *Edwards v. Mayor, etc., of Borough of Moonachie,* 3 *N. J.* 17, 22 (1949).

■ Perhaps suspecting the weakness of its first alleged source of authority, the defendant next points to *R. S.* 40:48–2 as containing the necessary statutory grant of power. It provides:

"Any municipality may make, amend, repeal and enforce such other ordinances, regulations, rules and by-laws not contrary to the laws of this state or of the United States, as it may deem necessary and proper for the good government, order and protection of persons and property, and for the preservation of the public health, safety and welfare of the municipality and its inhabitants, and as may be necessary to carry into effect the powers and duties conferred and imposed by this subtitle, or by any law."

It would appear that this statute is susceptible of two different interpretations: one that since the last clause beginning with the words "and as may be necessary * * *" is in the conjunctive, it confers no separate and distinct powers upon a municipality, but merely grants in terms powers incidental to those conferred by other statutes; the other that the statute constitutes an express grant of broad governmental and police powers to all municipalities and that the last clause is merely an added grant of incidental powers. This latter view finds considerable support in the cases, *R. S.* 40:48–2 being frequently cited as a source of general municipal police powers, see *Public Welfare Pictures Corp. v. Brennan,* 100 *N. J. Eq.* 132, 134 *(Ch.* 1926); *Wagman v. Trenton,* 102 *N. J. L.* 492, 493 *(Sup. Ct.* 1926); *Crisci v. Board of Commissioners of Raritan,* 119 *N. J. L.* 103, 106–107 *(Sup. Ct.* 1937); *Prinz v. Paramus,* 120 *N. J. L.* 72, 73–74 *(Sup. Ct.* 1938); *Bullock v. Wooding,* 123 *N. J. L.* 176, 178 *(Sup. Ct.* 1939); *N. J. Good Humor v. Bradley Beach,* 123 *N. J. L.* 21, 23 *(Sup. Ct.* 1939), and in the opinion reversing on other grounds, 124 *N. J. L.* 162, 165 *(E. & A.* 1940); *Librizzi v. Plunkett,* 126 *N. J. L.* 17, 20–21 *(Sup. Ct.* 1940); *Hunter v. Teaneck Twp.,* 128 *N. J. L.* 164, 171 *(Sup. Ct.* 1942); *O'Mealia Outdoor Advertising Co. v. Rutherford,* 128 *N. J. L.* 587, 589–590 *(Sup. Ct.* 1942);

*Hart v. Teaneck Township,* 135 *N. J. L.* 174, 176 (*E. & A.* 1947); *Kovacs v. Cooper,* 135 *N. J. L.* 584, 587–588 (*E. & A.* 1947). *Cf.,* dissenting opinion in *City Affairs, etc., Jersey City v. Jersey City,* 132 *N. J. L.* 552, 564 (*Sup. Ct.* 1945), affirmed 134 *N. J. L.* 180, 182 (*E. & A.* 1946). This interpretation of *R. S.* 40:48–2 as an express grant of general police powers to municipalities has been made impregnable by the continued legislative acquiescence therein, by the mandate of *Article IV, Section VII, paragraph* 11 of the *Constitution of* 1947 that acts concerning municipalities be liberally construed, and by the adherence thereto of the more recent judicial decisions, *Ricca v. Board of Commissioners,* 1 *N. J. Super.* 139, 142–143 (*App. Div.* 1948); *Edwards v. Borough of Moonachie,* 3 *N. J. Super.* 10, 14 (*App. Div.* 1949), reversed 3 *N. J.* 17 (1949); *Michaels v. Twp. Committee of the Twp. of Pemberton,* 3 *N. J. Super.* 523, 527 (*Law Div.* 1949); *City of Newark v. Charles Realty Co.,* 9 *N. J. Super.* 442, 457 (*Cty. Ct.* 1950); If more be needed, we refer to the recent decision in *State v. Mundet Cork Corp., supra,* 8 *N. J.* 359, 369 (1952), wherein we held that the enactment of an air pollution ordinance was "a function of the police power conferred on municipalities by *R. S.* 40:48–2 (originally enacted in 1917) for the protection of the welfare of their residents."

Plainly, therefore, *R. S.* 40:48–2 must be considered as an express grant of broad general police powers to municipalities. Such an interpretation of this statute, it is to be noted, is in keeping with other broad grants of powers to municipalities, as for example, *R. S.* 40:72–3 (powers of municipalities having commission form of government); *R. S.* 40:116–8 (powers of municipalities governed by boards of commissioners) and *R. S.* 40:55–32 (zoning powers). As the law now stands any municipality, in addition to any powers elsewhere more specifically granted, has authority by virtue of *R. S.* 40:48–2 to take such action "as it may deem necessary and proper for the good government, order and

protection of persons and property, and for the preservation of the public health, safety and general welfare of the municipality and its inhabitants," subject only to the limitation that such action not be prohibited by or inconsistent with the Constitution or the other statutes.

There can be little question but that this broad grant of police powers to a municipality encompasses the authority to enact an ordinance regulating the removal of soil. Both common knowledge and the evidence adduced before the trial court indicate that such an ordinance not only may be desirable but necessary for the protection of property and the preservation of the public health and welfare of a municipality. In the defendant borough the removal of soil has for years constituted a serious problem. At least four property owners have stripped their lands and sold the soil leaving pits of considerable depth. Land thus denuded and deformed casts a blight on all the surrounding area: water collects and affords breeding places for mosquitos, drainage and erosion problems arise, normal vegetation cannot grow but noxious weeds thrive. In short, the land itself is not only rendered useless for all normal uses, but the value of other lands in the vicinity is substantially reduced and the residents of the area generally are subjected to unhealthy, annoying and unsightly conditions.

The suggestion is made that the Legislature has provided other more specific methods of dealing with the problems arising from the removal of soil and that, therefore, an ordinance regulating such removal is inconsistent with these other methods. Admittedly when the Legislature has prescribed the procedure for dealing with specific local problems, a municipality is not free to deal with those problems without regard for the legislative prescription, *Magnolia Development Co. Inc. v. Coles, supra,* 10 *N. J.* 223, 227 (1952). In the instant case, however, we discern no other legislative scheme subverted by a regulatory ordinance of the type here involved. Conceivably the zoning power might be utilized successfully in certain instances to cope with the

problem (we do not purport here to pass upon the validity of a zoning ordinance for this purpose), but zoning is primarily prohibitive rather than regulative and the zoning laws most certainly are not here . subverted. The specific powers of a municipality or its board of health to abate the nuisances created by the removal of soil are no adequate answer to the problem, for preventive and not remedial measures are clearly called for. The provisions of the soil conservation laws, *R. S.* 4:24–1, *et seq.,* were obviously intended to supplement, not supplant, the powers of a municipality to deal with the problem of soil conservation, *cf. Zullo v. Board of Health, Woodbridge Tp.,* 9 *N. J.* 431, 436–437 (1952).

## II.

It appearing that municipalities have the authority to enact ordinances regulating the removal of soil, we must next consider the question of whether the ordinance in question is a proper exercise of that authority.

The preamble of the ordinance in question states that the governing body of the borough finds "that the unregulated and uncontrolled relocation, filling, excavation and removal of soil on a large scale has resulted in conditions detrimental to the public safety, health and general welfare, substantially hampering and deterring the efforts of the Borough * * * to effectuate the general purpose of municipal planning." Section 1 of the ordinance provides that, except in connection with construction on the premises, no soil shall be removed without a permit therefor from the mayor and borough council. Section 2 requires that all applications for a permit be accompanied by a contour map of the premises showing the topography thereof following the intended removal. Section 3 grants the applicant a hearing on request before the mayor and council and directs that they take into consideration soil erosion, drainage, soil fertility, lateral support slopes and grades of abutting streets, land values and

uses, and "such other factors as may bear upon or relate to the coordinated, adjusted and harmonious physical development of the Borough." Section 3 further provides that permission to remove soil shall be granted if "the Mayor and Council shall be of the opinion that the proposed soil removal will not create conditions inimical to the public health, welfare and safety, and will not result in the creation of any sharp declivities, pits or depressions, soil erosion or fertility problems, depressed land values, nor create any drainage, sewerage problems or other conditions of danger." Sections 4 and 5 establish the manner in which the removal shall be accomplished, the latter section stating that when permission to remove has been granted, the person in charge of the removal "shall not take away the top layer of arable soil for a depth of six inches, but such top layer of arable soil to a depth of six inches shall be set aside for retention on the premises, and shall be re-spread over the premises when the rest of the soil has been removed." Section 6 requires the filing of a bond in an amount to be fixed by the mayor and council to insure that the removal is accomplished in accordance with the permission granted; section 7 prohibits the removal of soil without a permit therefor first having been obtained; section 8 establishes penal sanctions for the failure to comply with the provisions of the ordinance; section 9 repeals prior inconsistent ordinances; and section 10 makes the ordinance effective as of the date of its passage, June 27, 1951.

Aside from section 5 of the ordinance we have no hesitancy in saying that it is reasonably designed to deal with the problem at hand and thereby to protect property and preserve the health and general welfare of the community. Section 5 which prohibits altogether the removal of the top six inches of soil at first blush causes some concern. At the trial, however, there was evidence to show that the so-called top soil in the community extended to a depth of ten to twelve inches and uncontradicted expert testimony to the effect that it took nature 1,000 years to produce a single

inch of such soil. It appears, moreover, that top soil is the best and most fertile of soils and has water absorbing and retaining qualities not to be found in the lower strata of soil. In the light of the evidence before us we are inclined to the view that the prohibition against removing the top six inches of soil is not arbitrary and unreasonable. In this view we are not alone, for other states have held such a prohibition valid, *Lizza & Sons v. Town of Hempstead*, 69 *N. Y. S. 2d* 296 (*Sup. Ct.* 1946), affirmed 272 *App. Div.* 921, 71 *N. Y. S. 2d* 14 (*App. Div.* 1947); *Town of Burlington v. Dunn*, 318 *Mass.* 216, 61 *N. E. 2d* 243, 168 *A. L. R.* 1181 (*Sup. Jud. Ct.* 1945), *certiorari denied*, 326 *U. S.* 739, 66 *S. Ct.* 51, 90 *L. Ed.* 441.

█ The sole remaining question is whether the ordinance establishes adequate standards to guide the governing body in the issuance of permits to remove soil. Quite plainly it does. Section 3 sets forth in some detail and as specifically as practicable the facts which the governing body must consider in reviewing an application and the conclusions it must arrive at before an application can be granted.

The various arguments raised by the plaintiffs to the effect that the ordinance authorizes an unconstitutional taking of their property without due process of law and without compensation necessarily fall in the light of our conclusion that the ordinance constitutes a reasonable exercise of the police power in the public interest. As stated in *Welsh v. Morristown*, 98 *N. J. L.* 630, 634 (*Sup. Ct.* 1923), affirmed *o. b., Welsh v. Potts*, 99 *N. J. L.* 528 (*E. & A.* 1924), and quoted with approval in *State v. Mundet Cork Corp., supra*, 8 *N. J.* 359, 371 (1952), *certiorari* denied, 73 *S. Ct.* 14 (1952):

"Avowedly, the ordinance was enacted in the exercise of the police power. Every citizen holds his property subject to the proper exercise of this power, either by the legislature directly or by public or municipal corporations to which the legislature may delegate it. It is well settled that laws and regulations of this character, relating to the comfort, health, convenience, good order and general welfare of the inhabitants, though they may disturb the enjoyment of in-

dividual rights, are not unconstitutional, though no provision is made for compensation for such disturbances. They do not appropriate private property for public use, but simply regulate its use and enjoyment by the owner. If he suffers injury, it is either *damnum absque injuria*, or, in theory of the law, he is compensated for it by his sharing the general benefits which the regulations are intended and calculated to secure."

The judgment below is affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN—7.

*For reversal*—None.