95 N.J. Super. 495 (1967)
231 A.2d 837
CRANBERRY LAKE QUARRY CO., PLAINTIFF - RESPONDENT,
v.
CARL O. JOHNSON, THOMAS CRAIG, THOMAS M. MACKERLEY, MEMBERS OF THE TOWNSHIP COMMITTEE OF BYRAM, AND BYRAM TOWNSHIP, A MUNICIPAL CORPORATION, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued January 9, 1967.
Reargued April 3, 1967.
Decided June 22, 1967.
*504 Before Judges CONFORD, FOLEY and LEONARD.
Mr. Ervan F. Kushner argued the cause for respondent (Mr. Edward H. Saltzman, attorney).
Mr. Francis E. Bright argued the cause for appellants (Messrs. Dolan & Dolan, attorneys).
Mr. Richard Newman, Deputy Attorney General, argued the cause on behalf of amicus curiae (Mr. Arthur J. Sills, Attorney General of New Jersey).
The opinion of the court was delivered by CONFORD, S.J.A.D.
Defendants appeal from that part of a judgment entered in the Law Division in an action in lieu of prerogative writs which invalidated an ordinance of defendant township regulating the operation of quarries. A second ordinance limiting use of a road providing access to *505 plaintiff's quarry property was also invalidated, but defendants do not appeal this determination. In view of the foregoing disposition the court found it unnecessary to pass upon plaintiff's attack on the regulatory ordinance on grounds of conflict of interest of defendant township committeemen.
Plaintiff is the assignee of a royalty lease agreement entered into with the owners of 70 acres of land in Byram Township, Sussex County, which allows the lessee to quarry, process and sell stone from the property. The leased property is almost entirely one solid rock ledge about 230 feet high and suitable for quarrying. Route 206 extends along the eastern face of the property, as does a railroad spur. Whitehall Road extends from Route 206 onto the property, runs northward within the property for a distance, and provides access to the ledge by connection with a road which doubles back in a southwesterly direction. It was found below that no other practical access route to the ledge could be afforded.
Byram Township comprises 20 square miles and has a year-round population of 1,600 which swells to approximately 8,000 during the summer months. Much of the summer population lives along Panther and Cranberry Lakes. The northern end of Cranberry Lake is about 1,500 feet from the quarry property.
Plaintiff commenced operating a small portable crusher on the premises, and clearing away trees and brush for quarrying the main rock ledge, almost immediately after the lease was assigned to it on August 1, 1962. Plaintiff and American Aggregates, Inc. were the only quarry operators in the township at this time. The latter, also operating on a limited basis, was the lessee of Malmberget Inc., in which the three individual defendants held stock. These individuals comprised Byram's township committee at the time the controverted ordinances were passed  September 27, 1962.
On October 24, 1962, subsequent to filing its complaint in this action, plaintiff obtained a temporary restraining order against the enforcement of the quarrying ordinance and part *506 of the road ordinance. Defendants had previously attempted to divest themselves of their interests in the other quarry. They re-passed the ordinances on November 29, 1962 in somewhat amended text, and plaintiff thereafter filed the amended complaint on the basis of which the judgment below was rendered.
The trial court invalidated the entire quarry ordinance because in its judgment so many of its operative provisions were either pre-empted by state laws and regulations or unreasonable, or both, that a cohesive, integrated ordinance could not survive. Moreover, the court held that the standards to be met for the issuance of a license were invalid because not sufficiently definite. In reviewing these determinations we must set forth the challenged ordinance in some detail.
The ordinance requires a license to be obtained from the township committee before any quarrying may be conducted by a party within the township limits (§ 102). An application for a license is to contain the name and address of the applicant, location of the premises, statement of ownership, proof of prescribed liability insurance coverage, and plans and specifications covering buildings, equipment and fences (§ 103).
The ordinance as first promulgated in 1962 required the township committee to issue a license if such issuance would not adversely affect
"* * * the public health, safety and general welfare, and particularly the following factors:
A. Land values and uses in the area.
B. Proximity to residences, schools and churches in the area.
C. Such other factors as may bear upon or relate to the coordinated, adjusted and harmonious physical development [sic] of the Township."
Subsequent to the decision of the trial court, however, the township committee amended § 107 to require the committee to consider with reference to the public health, safety and general welfare:
*507 "A. Drainage.
B. Lateral support slopes and grades of abutting streets and lands.
C. Land values and uses.
D. Proximity to residences, schools and churches.
E. Effect on Underground water supplies in use.
F. Such other factors as may bear upon or relate to the coordinated, adjusted and harmonious physical development of the Township."
The amendment goes on to state:
"If the committee finds that the license as granted will not create conditions inimical to the public health, welfare and safety and will not result in the creation of any sharp declivities, pits or depressions, depress land values and will not create any drainage or sewage problems or other conditions of danger nor adversely affect any underground water supplies in use, the license shall be issued."
Those subsections of § 106 of the ordinance regulating the operation of quarries which were specifically challenged as invalid by reason of pre-emption or unreasonableness are reproduced in full with the same letter designation as in the ordinance section:
"A. All quarrying and rock crushing shall be conducted so as to create a minimum of annoyance from noise and dust to nearby owners or occupants of property.
B. Quarrying and rock crushing may only be carried on from Monday through Friday between the hours of 8:00 a.m. and 5:00 p.m. prevailing time. No quarrying or rock crushing shall be conducted on legal holidays.
C. Any licensee shall provide water under pressure at the scene of all operations. All drifting [sic] must be done by wet drilling and stone or other material excavated must be washed before being removed for crushing or other processing. Areas where blasting has occurred must be sprayed with water as soon as possible after each blast to reduce dust.
D. The roads or rights of way within the tract must be treated with calcium chloride or road oil so as to reduce dust to a minimum. Calcium chloride must be applied at least once every ten days from May 1 to November 15 of each year.
E. All rock crushing must be done in a jaw type crusher with a capacity not in excess of thirty inches. All crushing and grading operations must be conducted in enclosed buildings and the design of such buildings must be approved by the Township Engineer so that it will be clear that the building will retain all dust created by crushing. *508 After crushing all stone must be washed before loading to reduce dust to a minimum. * * *
G. A fence shall be erected around the outside limits of the premises to be licensed which shall be woven wire of the cyclone type at least five and one half feet high and gates shall be used as a means of entrance and exit which shall be of equal height. Such gates shall be locked shut when not in actual use and shall be attended during working hours.
H. A seismic recording shall be made of the blast level during any blasting on the licensed premises and the record thereof shall be available at all times for inspection by Township officials."
Other subsections forbid the depositing of quarried material on adjacent property, require adherence to the terms of the application, and call for signs about the premises to identify the licensee. Monthly inspections are required, with deposits and costs to be paid by the licensee (§ 104, 105). Licenses may be revoked or suspended after a hearing (§ 108), and fines or imprisonment may be assessed for any violations (§ 109). A standard severability clause is included.

I
At the outset we reject, as did the trial court, plaintiff's contention that the ordinance is invalid in toto because the subject matter has been pre-empted by the Mine Safety Act, N.J.S.A. 34:6-98.1 et seq. As its title accurately indicates, that act is purposed to provide "for the regulation of safety and health of workers and occupational conditions in the mines of the State and the protection of mining property". (Emphasis added) Quarries are included in the definition of mines. N.J.S.A. 34:6-98.2. The Commissioner of Labor and Industry is empowered to promulgate rules and regulations having the force of law. N.J.S.A. 34:6-98.4 One of these regulations in evidence, Safety Regulation No. 12 governing pits and quarries, deals extensively with electricity and water on mining premises, safeguards for use of machinery, fire protection and sanitation. N.J.S.A. 34:6-98.6 requires, inter alia, adequate medical care on the premises and availability of stretchers and emergency *509 oxygen. N.J.S.A. 34:6-98.7 is concerned with guarding both the safety of employees and of other persons frequenting mines and quarries. N.J.S.A. 34:6-98.10 contains the following limitation on municipal action:
"No municipality or other governmental subdivision shall have the power to make any ordinance, by-law or resolution providing for safety to workers in the mining industry or providing for protection of property that does not comply with the standards herein established by this act, and the rules and regulations promulgated by the commissioner hereunder." (Emphasis added)
This last limitation lends strength to the conclusion that municipal legislation regulating quarrying is not per se invalid where it seeks to protect the general public rather than mining employees, and adjacent properties rather than the quarry itself. See Dallenbach Sand Co. v. Mayor, etc., So. Brunswick Tp., 90 N.J. Super 218 (App. Div. 1966). Moreover, it indicates that local legislation, although incidentally affecting mining employees and property, is valid so long as it does not contradict or impair the standards fixed by or under the state law treating of the subject. Thus, this ordinance, which appropriately purports to regulate dust and noise for the general public benefit, and provide for public protection, is not invalid merely because it also subserves the safety of mine workers.
Local laws are not pre-empted by state laws where, although they deal with the same subject, they are directed toward different ends. Chaiet v. City of East Orange, 136 N.J.L. 375 (Sup. Ct. 1948); Ostroff v. Bd. of Com'rs of Camden, 7 N.J. Super. 245 (App. Div. 1950). This proposition is at least true where, as here, there is no demonstrable need for uniform legislation on the subject throughout the State. Cf. Wagner v. Mayor & Municipal Council of City of Newark, 24 N.J. 467 (1957).
In assessing whether the individual ordinance regulations of § 106 have been pre-empted by state laws or regulations, we must accordingly, discern whether the local law interferes *510 with the effect and operation of the state regulations. The trial court passed on the issue of pre-emption only with respect to § 106(C), § 106(E), and § 106(G), finding each of them invalid in light of existing state law. We disagree with these conclusions.
Insofar as § 106(C) specifies wet drilling, we see no conflict with state law. Nowhere in the relevant statute or regulations cited to the court is there any stipulation of the type of drilling method to be applied. According to the proofs, wet drilling is apparently one of several general methods feasible in quarrying. The township may select a particular reasonable method in light of its concern to protect the general public against excessive dust. The township's interest in protecting the public from dust is not shown to conflict with the state's concern to protect mining employees. See Chaiet v. East Orange, supra. Similarly, the municipal designation of jaw crushers (§ 106(E)) as opposed to other types of crushers could be upheld if there were some basis in the public interest for such a specification and it were not otherwise demonstrably unreasonable. The arbitrariness of the ordinance in this latter respect will be discussed below.
The trial court also concluded that the township could not as against state regulations specify a type of fence to enclose quarry property (§ 106(G)). However, N.J.S.A. 34:6-98.6(e) merely requires warning notices around surface entrances and exposures of mines and quarries, and "guardrails, fences or other approved means, sufficient to prevent accidental fallings into any abandoned mine, pit or quarry as the commissioner may direct." (Emphasis added) Safety Regulation No. 12 § 30.1.15, gives the Commissioner power to require erection of an effective barrier to provide protection "against the drop or fall of persons." It may be questioned whether this last regulation is within the Commissioner's regulative powers, since it appears to cover operative quarries as well as abandoned ones. In any event, that the State by legislation may have required certain protection *511 of the public would not here foreclose additional municipal action for the public health, safety or welfare not inconsistent with the state objective. See Masters - Jersey, Inc. v. Mayor & General Council of Borough of Paramus, 32 N.J. 296 (1960). We regard the local fence requirement as not pre-empted.
With regard to the municipal requirement of approval of buildings by the township engineer (§ 106(E)), N.J.S.A. 34:6-98.3 empowers the mine safety section chief within the Bureau of Engineering and Safety to inspect and investigate the methods, machinery, sanitation and ventilation of apparently all quarrying structures. This is not clear sanction for state approval of all building plans, and certainly not authority for exclusive approval. However, the statutory concern with "ventilation," apparently in the interest of workers, is offended by the municipal objective of retaining dust in structures. The statutory objective must control and the municipal regulation in this particular is invalid. As to invalidity of this ordinance regulation on other grounds, see infra.
The trial court deemed it unnecessary to rule on any other subsection in relation to pre-emption, save for validating § 106(D) pertaining to controlling dust from roads. We agree that that section is valid. We conclude, however, that § 106(H) (seismic records) is contravened by N.J.S.A. 21:1A-139 (State Explosives Act) which gives the state exclusive jurisdiction over the regulation and use of explosives, the state act to supersede "any existing ordinance, by-law or resolution of any municipality or other governmental subdivision pertaining to the manufacture, sale, transportation, storage or use of explosives."

II
We pass to a consideration of the validity of the regulatory provisions of the ordinance on grounds other than pre-emption. A presumption of reasonableness attends municipal enactments. Guill v. Mayor, etc. of Hoboken, 21 *512 N.J. 574, 581 (1956). Nevertheless, since penalties are imposed for violations, a licensee is entitled to the same precision and specificity of language as in the case of a penal statute. Township of Maplewood v. Tannenhaus, 64 N.J. Super. 80, 89 (App. Div. 1960), certification denied 34 N.J. 325 (1961); Borough of Verona v. Shalit, 92 N.J. Super. 65, 69 (Cty Ct. 1966).
§ 106(A)  The requirement that dust and noise be minimized, is, without more, too vague to be enforceable.
§ 106(B)  The trial court declined to rule on the validity of the restricted hours of operation. Inasmuch as plaintiff has not demonstrated that the hours prescribed would be unreasonably restrictive in the light of the nature of quarrying operations, we uphold this limitation. Compare Houdaille Con. Mats. Inc. v. Bd. of Adj., Tewksbury Tp., 92 N.J. Super. 293, at p. 302 (App. Div. 1966). Prohibition of Saturday and holiday operation is not per se invalid, id., at p. 302, and no proofs were adduced establishing the unreasonableness of that regulation in relation to plaintiff.
§ 106(C)  From the evidence, it appears that the functionally appropriate method of dust control is initially determined by the method of drilling. Wet drilling employs wet methods of dust control while other forms of drilling use exhaust systems. Section 31 of Safety Regulation No. 12, supra, relating to dust control, imposes certain maximum concentrations of dust in quarrying operations and permits a choice of one or more specified methods of dust control, including local exhaust systems and wet methods. Implicity, then, the State appears to recognize the utilization of wet drilling as a reasonable method.
Plaintiff's expert civil engineer, experienced in quarry operations for many years, stated that wet drilling was less economical than other methods and "largely supplanted" by them. However, without a clear demonstration that wet drilling is so unreasonably burdensome as to warrant the conclusion of arbitrariness in the municipal requirement therefor, we are compelled to uphold this provision. The *513 municipality has an obviously strong interest in preventing undue dissemination of dust throughout the atmosphere. Plaintiff's expert acknowledged that wet drilling was feasible in this quarry, and the State has as noted recognized its potential utility in the industry. Moreover, alternate methods utilize exhaust systems which are required, according to § 31.3.4 of Safety Regulation No. 12, to discharge dust to the outer air. However, the municipality, is, as seen above, legitimately interested in protecting the general public from just such a discharge.
The requirements that blast areas be wetted down and that excavated material be washed before removal for processing are attacked by plaintiff as unreasonable because of slipping hazards in cold weather. However, the state regulation (§ 31.4.3), which presumably reflects expert experience in this area, states that where used "at the point of dust generation * * * [t]he application of water shall be so controlled as not to create a slipping hazard." (Emphasis added) Inasmuch as dust control is, under the regulation, to be tested "when all machines and other processes to which the control methods being tested apply" are operative, it seems clear that the regulation contemplates the feasibility of wet method at all points of dust generation in the processing of rock. This being so, § 31.4.3 appears to teach that water can with proper precautions be controlled to prevent a slipping hazard, presumably even in subfreezing weather. If instances arise where such control is not in fact feasible, then the local ordinance would to that extent not be enforceable. It does not follow, however, that the provision must fall in toto merely because on rare occasions the required wetting down may entail slipping hazards. We therefore do not find § 106(C) to be unreasonable.
§ 106(D)  Plaintiff does not dispute the trial court's finding that this provision is reasonable, and we are in accord.
§ 106(E)  Defendant Johnson testified that the type and size of the crusher were ascertained by measuring *514 an opening on plaintiff's temporary portable crusher at 24 inches and allowing for some enlargement. He had no expertise in this field and he made no effort to ascertain the practical consequences of this limitation. Significantly, plaintiff's experts testified that crushers were designated either by two linear measurements or by output per hour, and some confusion attended their efforts to ascertain the size limitation of the crusher specified. The trial court found from the evidence, and we concur, that by any interpretation such a machine would be too small for any major quarrying for road material, as here contemplated. We find the designation to have been arbitrarily arrived at, without relation to legitimate municipal interests in dust or noise control or to the practicalities of quarrying, and we concur in the trial court's invalidation of the requirement.
What we recently said with respect to a restriction on the number of truck deliveries conditioning a special use permit in connection with the construction and operation of a concrete plant is applicable here: `This limitation is not justified by anything in the record and appears to arbitrarily limit the volume of plaintiffs' potential business." Houdaille Con. Mats. Inc. v. Bd. of Ad. Tewksbury Tp., supra, 92 N.J. Super., at p. 303.
We have already held the building regulation provision in § 106(E) to be invalid on pre-emption grounds. We further agree with the trial court's holding that this provision, in requiring that the buildings retain "all dust," is impossible of fulfillment and unreasonable. The licensee is without guides by which to conform his conduct to the local demands and avoid fines and penalties. See Township of Maplewood v. Tannenhaus, supra. He does not know what aspects of the buildings will be scrutinized, and what measures for compliance may be taken. Cf. N.J. Dept. of Health v. Roselle, 34 N.J. 331, 350 (1961).
§ 106(G)  We disagree with the trial court's conclusion that the fencing requirement is not reasonable. There would seem to be evidenced a justifiable concern for the populace, *515 notably summer vacationers who frequent nearby areas and are likely to wander onto the premises unless restrained. Plaintiff's expert admitted that his own company uses the type of fencing required.
§ 106(H)  We have already held this section invalid on pre-emption grounds. We regard it also as unreasonable. It is unnecessarily burdensome to require records of all blasts. Defendants' argument that local inspection of blasts will aid in enforcing state law is without merit. State regulations in evidence make it clear that such seismographic records are not necessary for state enforcement purposes.

III
In assessing the validity of the ordinance as a whole it is necessary next to consider the licensing requirements. Plaintiff charges that the standards set forth for this purpose are too broad and vague for validity. Although defendants nowhere urge this construction, we will assume the ordinance to require, as did the trial court, compliance with the valid provisions of § 106 as a condition of receiving a license under § 107. This was the course taken in Howell Tp. v. Sagorodny, 46 N.J. Super. 182 (App. Div. 1957), affirmed o.b. 25 N.J. 502 (1958), on the premise that a municipality would not issue a license where the application showed noncompliance with the ordinance.
However, the fact that the remaining valid provisions of § 106 pertaining to fences, road dust and the like are definite and particularized does not contribute to the adequacy of the broad standards of § 107 here attacked by plaintiff which also must be met by an applicant. We are satisfied that the licensing requirements can be sustained as valid only if there may be gleaned from § 107 itself "a [proper] standard or norm for the guidance of the authority clothed with the power to grant or withhold a license." Raritan Tp. v. Hubb Motors, Inc., 26 N.J. Super. 409, 410 (App. Div. 1953).
*516 An appeal is decided with reference to the state of the law at the time of the decision of the appeal. S & L Associates, Inc. v. Washington Twp., 35 N.J. 224 (1961). Hence in scrutinizing § 107 we must view it in its present amended form, as set forth earlier in this opinion. Without pausing to comment on the correctness of the trial court's view of the licensing provision as it originally stood, we are satisfied that it is valid as amended.
The licensing provision is practically identical with that contained in a soil removal ordinance and upheld in Fred v. Mayor, etc., of Old Tappan, 10 N.J. 515 (1952). And see L.P. Marron & Co. v. Mahwah Tp., 39 N.J. 74 (1963). The court in Fred upheld the similar provision against an attack of failure to provide adequate standards as follows:
"Section 3 sets forth in some detail as specifically as practicable the facts which the governing body must consider in reviewing an application and the conclusions it must arrive at before an application can be granted." (10 N.J., at p. 542)
Although rock removal and soil removal may in some respects present somewhat dissimilar problems of regulation, in others the problems are closely cognate, and as a whole they are in our view sufficiently related in significant respects to justify the conclusion that standards adequate for soil removal purposes are adequate for purposes of quarrying control.
Further, to the extent that the problems requiring regulation in this type of industry are akin to those which arise in zoning, cf. Fred v. Mayor, etc., of Old Tappan, supra, 10 N.J., at pp. 521-522, it is to be noted that rather general standards for administrative action have been sustained in that area. Ward v. Scott, 11 N.J. 117 (1952); Andrews v. Ocean Tp. Board of Adjustment, 30 N.J. 245 (1959); Schmidt v. Board of Adjustment, Newark, 9 N.J. 405 (1952).
*517 Moreover, we are admonished to treat a municipal ordinance liberally in favor of validity and to view the provision "in the light of its surroundings and objectives." Ward v. Scott, supra, 11 N.J., at p. 123. In a quarry operation the public health, safety and welfare could be implicated if, for example, the proposed quarry created drainage or sewerage problems, dangers to safety from severe alteration of the landscape, or problems related to any of the other factors mentioned in the ordinance. The ordinance is presumably designed to cope with these police-power contingencies. Discrimination or unreasonableness in applying the ordinance is of course always subject to judicial remedy.
We find the licensing procedure free from attack on grounds of vagueness of standards.

IV
We turn to the question whether the entire ordinance must fall because some of its parts are invalid. The presence of a severability clause tends to indicate that the municipality intended to retain whatever is not invalidated by the court. Howell Tp. v. Sagorodny, supra. The ultimate test, however, is whether the ordinance, "stripped of those provisions which are invalid, remains a comprehensive and cohesive regulatory ordinance with appropriate sanctions for its enforcement." Zullo v. Board of Health, Woodbridge Tp., 9 N.J. 431, 441 (1952).
We think the ordinance passes this test, and, stripped of its invalid parts, should stand. It comprehensively controls dust created by the blasting and processing operations, and in the use of roads on the quarry property. It also protects the public interest by policing the effect the proposed quarry operation will have on the public health, safety and welfare in other respects. The sanctions are commensurate with the compliance called for. The deletion of the portions held invalid does not affect the potential effective application of the remainder as a whole to the subject matter of the intended regulation.

*518 V
The trial court having invalidated the ordinance on other grounds, it did not dispose of plaintiff's contention that the ordinance was invalid because passed by the township committee at a time when its three members had disqualifying interests in another quarry in Byram. Our own determinations thus far, however, require that we direct our attention to this contention.
As noted above, only two quarry operations existed in Byram in 1962, the one leased by plaintiff and the second owned by Malmberget, Inc. and leased to American Aggregates, Inc. The latter lease, dated June 15, 1962, and running for 40 years and 6 months, contained provision for royalty payments to Malmberget based on the quantity of stone removed, with a sliding scale of guaranteed minimum yearly payments. American began limited operations on the site immediately.
Defendant Johnson was one of three who incorporated Malmberget in 1958 for the purpose of quarrying. The stock certificate book in evidence reveals the issuance of 285 shares of stock on January 5, 1959 to eight individuals, including the three individual defendants. Subsequent issuances in 1959 and 1960 brought the holdings of the individual defendants as of September 1962, the date the controverted ordinance was first passed, to the following: Johnson  35 shares; Craig  30 shares; Mackerley  30 shares; total shares outstanding 325. The shares were purchased at $100 each. It appears that throughout the period of their stock holdings the three defendants were directors but not officers of Malmberget. They denied participating in the negotiation of the lease with American Aggregates.
At the time American and plaintiff began quarry operations Byram had no ordinance regulating quarries. At a public meeting of the township committee in August 1962 demands were made by citizens for regulation. The township committee passed the disputed quarry ordinance as well *519 as the Whitehall Road ordinance on September 27, 1962. In identical transactions entered into on October 22, 1962, defendants sold their shares at $100 each to other shareholders, down-payment in cash and the balance by installment payments with interest. In none of the sales were payments completed by November 1962 and in only one of the transactions was interest apparently paid. The ordinances were repassed by the committee on November 29, 1962. However, it was not until September 1963 that the shareholders, as they were apparently required to do, approved the stock transfers, and not until October of that same year that stock ownership was transferred on the corporate books.
The first question to be resolved is whether the defendants held an interest in Malmberget as of November 29, 1962. Plaintiff argues such an interest existed because the sales were sham and because stock ownership was not transferred until October 1963. Plaintiff has offered no proof demonstrating the sales were not valid and regular. Defendants' failure to summon the purchasers to testify does not, as plaintiff contends, necessarily give rise to any adverse inferences, particularly since the burden of proof is on plaintiff, and defendants adduced proof of the sale through their own testimony and corporate records. We cannot find that beneficial ownership of the shares did not pass to the purchasers. However, defendants did have some interest in Malmberget as of November 29, 1962, since they were still shareholders of record at that date. The corporate stock book is determinative of the right to vote in any election. N.J.S.A. 14:10-5 and 6.
No doubt even this residual stock interest in Malmberget was not compatible with the degree of disinterest desirable in public officials passing on an ordinance like this one in the circumstances. However, whether that interest suffices to invalidate the ordinance requires first a determination of whether the ordinance is quasi-judicial or legislative in nature, inasmuch as the scope of the pertinent inquiry and the nature of the conflict necessary for invalidation may depend *520 to some extent on the criterion stated. We regard the ordinance as legislative, prescribing, as it does, general rules of conduct rather than imposing burdens or conferring privileges in specific cases based on specific findings. See Kuberski v. Haussermann, 113 N.J.L. 162, 168 (Sup. Ct. 1934), and cases there cited.
Our courts have indicated a disposition to treat conflicts of interest more strictly in relation to quasi-judicial acts than legislative acts. See Aldom v. Borough of Roseland, 42 N.J. Super. 495, 508 (App. Div. 1956); Pyatt v. Mayor, etc., of Dunellen, 9 N.J. 548, 554, 555 (1952). With legislative acts invalidation ordinarily results only if the act is "tainted with fraud, or palpably not in the service of the public interest, or otherwise a clear perversion of power," whereas quasi-judicial acts fall if there is found "private interest at variance with the impartial performance of * * * public duty." Pyatt, at pp. 554, 555. However, there are indications that the distinction may be diminishing, at least in the area of local land control. In Van Itallie v. Borough of Franklin Lakes, 28 N.J. 258 (1958), the court extended to members of a town's governing body, whenever called upon to act on a planning board's recommendation, the prohibition in N.J.S.A. 40:55-1.4 of a planning board member's acting "on any matter in which he has, either directly or indirectly, any personal or financial interest." See also LaRue v. Township of East Brunswick, 68 N.J. Super. 435 (App. Div. 1961), where the court held itself willing to invalidate an amendatory zoning ordinance upon a showing (which was not forthcoming) that a public official "by reason of a personal interest in the matter, is placed in a situation of temptation to serve his own purposes, to the prejudice of those for whom the law authorizes him to act." (at p. 447)
On the whole, mindful of our courts' long-standing reluctance to interfere with municipal legislation save in cases of clear abuse and perversion of power, we are not constrained to invalidate the re-passed ordinance on the basis of the residual stock interests then retained by the individual defendants. *521 We have perceived no irregularity in their attempt to divest themselves of the stock prior to passage of the ordinance in November 1962 and only a seemingly fortuitous retention of interest on their part thereafter. No showing of fraud has been demonstrated, nor does the ordinance appear to involve a disservice to the public. It is also apparent that to the extent that the ordinance hampers untrammeled quarrying, it affects Malmberget as well as plaintiff.
However, even if the ordinance were otherwise subject to invalidation because of conflict of interest, we would be constrained to agree with defendants' contention that the doctrine of necessity requires sustaining it. Although that doctrine has been traditionally applied to situations where disqualification of a person acting in a judicial capacity would prevent consideration of a matter which must necessarily be disposed of, we perceive no reason why it should not be applied as circumstances warrant to quasi-judicial or legislative activities as well. In Downs v. Mayor, etc., South Amboy, 116 N.J.L. 511 (E. & A. 1936), the court, after finding no cause for disqualification, noted that even if three of five councilmen would otherwise be disqualified from voting on an ordinance authorizing the vacation of streets to allow the needed extension of railroad facilities, they could not be disqualified where the record showed the matter could not be delayed without the loss of needed federal funds.
The record in the instant case shows a reasonable public necessity for an ordinance regulating quarries at the time this ordinance was adopted, in view of the fact that two quarries had commenced operation in Byram during the summer of 1962 at a time when no quarry ordinance was in force and the patent desirability of such local legislation in the interest of the public welfare. Cf. Pyatt v. Mayor, etc., of Dunellen, supra, 9 N.J., at p. 557.
We therefore hold the ordinance not to be invalid because of any conflict in interest.

*522 VI
Plaintiff also argues that the quarry ordinance is so inextricably bound up with the ordinance governing the access road to the rock ledge (which latter ordinance was invalidated by the trial court on grounds that it was arbitrary and unreasonable), as to fall with the latter.
The road ordinance excluded trucks over five tons gross weight from parts of Whitehall Road, including that section which extends through the quarry property. It is not demonstrated that the two ordinances "were part and parcels of a single plan, as much so as if they had been combined in a single ordinance." Wiesenthal v. Atlantic City, 73 N.J.L. 245, 248 (Sup. Ct. 1906). The road ordinance affected as a practical matter only the plaintiff; the quarry ordinance pertains to and affects all quarries. The ordinances are not so intimately bound together in subject matter that we may properly invalidate the major regulatory ordinance merely because of invalidity of the road ordinance.

VII
Plaintiff also argues that the ordinance is a device for illegal spot zoning. This argument was not raised in plaintiff's complaint nor did it appear in the pretrial order. Accordingly, we need not consider it here. However, the argument is devoid of merit on its face. Spot zoning is the abuse of that aspect of the zoning power which consists of the territorial division of the municipality in accordance with appropriate restrictions of land use. This municipality had no zoning ordinance and thus had not exercised the zoning power, as such. There is no prerequisite for the adoption of a zoning ordinance in order for a municipality to exercise its general police power under R.S. 40:48-2 to regulate businesses. See Fred v. Mayor, etc., of Old Tappan, supra, 10 N.J., at pp. 520-521. And this notwithstanding that in so doing regulation of land uses may be incidentally effected.
*523 We also reject, because not raised below, plaintiff's contention that prior uses of plaintiff's property rendered it a nonconforming use immune from the operation of the ordinance. We point out, however, that the protection of a nonconforming use does not apply to public health regulations. Shaw v. Byram Tp., 86 N.J. Super. 598 (App. Div. 1965).
For the reasons stated the judgment is reversed and the cause remanded for entry of a final judgment conforming with this opinion.