JEAN MOSELY, ROBERT McNANY, JOSEPH T. KURZEJA AND EARL N. COCHARIO, PLAINTIFFS, v. HARRY C. KATES, CITY CLERK AND THE CITY OF SUMMIT, NEW JERSEY, A MUNICIPAL CORPORATION, DEFENDANTS.

Superior Court of New Jersey
Chancery Division

Decided April 16, 1974

*Mr. Robert B. Bourne* for the plaintiffs (*Messrs. Joshua M. Levin and Jonathan Plaut* on the brief and of record).

*Mr. Russell T. Kerby, Jr.* for defendants.

FULOP, J. S. C.   This action was instituted by citizens and residents of the City of Summit against the municipality and the city clerk to have the apportionment of the city declared

unconstitutional and to require the adoption of some other plan which would provide more just representation in municipal affairs to plaintiffs and others who live in the same area as they do.

The City of Summit was incorporated in 1899 under a statute (L. 1899, c. 52) now, as supplemented, an act saved from repeal, N. J. S. A. 40:109–3(1) to 40:109–3(102), applicable to cities having a population of less than 12,000. The statute was inoperative in any such city until adopted by a majority of the voters. The statute was adopted in Summit on April 11, 1899 by 804 votes in favor and 163 against. Only one other city in the State, Englewood, adopted the statute.

According to the 1970 census, the City of Summit has a population of 23,620. Its area is 6.01 square miles. It is still operating under the 1899 charter.

Plaintiffs live in a section of the city which they refer to as "East Summit," a popular designation for an undefined area in the eastern portion of the city. Plaintiffs allege that East Summit is composed of former voting districts 9, 10, 11, 12 and 13. At least one witness disagreed with this definition, expressing the view that old district 9 is not a part of East Summit. In any event, these designations have been superseded by a redistricting plan adopted in February 1973 and first utilized in the 1973 elections.

From 1899 to 1973 the city was divided into two wards separated by the Erie-Lackawanna Railroad tracks. The 1970 census showed that there were 9,376 residents in Ward I and 14,244 residents in Ward II. This action was instituted on October 24, 1972. On January 30, 1973 the Common Council of the City of Summit adopted an ordinance providing for the appointment of a commission pursuant to N. J. S. A. 40:44–1 to 40:44–8, inclusive, to change the lines and boundaries of the two wards to equalize the population therein. The ordinance provided for the retention of two wards.

The mayor appointed two registered Republicans and two registered Democrats to the Commission, as provided in N. J. S. A. 40:44–2. Under N. J. S. A. 40:44–6 the mayor is authorized to call a meeting of the commissioners and to break a tie vote if one should occur.

The mayor and the two Republican commissioners submitted a plan under which each of the two wards would have exactly the same number of voters as shown in the 1970 census, and this became the official apportionment. The minority members dissented and offered other plans which perhaps would have provided greater representation for East Summit.

What plaintiffs designate as East Summit now falls in Districts 1, 2, 3, and 4 and part of Districts 5 and 6 in the Second Ward, and District 2 of the First Ward. According to the statistics furnished by plaintiffs, the population of East Summit is 5,461. Of these 1,460 or 27% are now in Ward I and 4,001 or 73% in Ward II. The total population of each ward is (or was as of the date of the redistricting) 11,810, or one-half of the city population.

As heretofore, there are seven members of city council — three members are elected from each of the two wards, one each year for three years. One councilman is elected from the whole city at large for a 2 year term. The mayor is elected at large for a four-year term. These officeholders receive no salary. At present all are and have long been Republicans.

In November 1973 there were 13,605 registered voters in the city, of whom approximately 7,049 voted (two districts in Ward I are missing from the figures in evidence). In Ward I there were 6,752 registered voters of whom approximately 3,646 voted. In Ward II there were 6,853 registered voters of whom 3,863 voted.

Governor Byrne, the Democratic candidate, carried every district in the city. The vote for councilman-at-large totaled 3,752 for the Republican candidate and 3,408 for the Democratic candidate. The vote for member of the common coun-

cil from the First Ward was 1,943 for the Republican and 1,661 for the Democrat. In the Second Ward, the vote was 1,993 for the Republican and 1,644 for the Democrat. The East Summit districts were generally carried by the Democratic candidates.

The statistics presented from census records show that the population of Census Tract 380, most of East Summit, includes 14.3% of black citizens while the rest of the city has only 3.1% of black persons. In the same tract 42.4% are foreign-born or second generation Americans, while the rest of Summit has only 28.7% of such residents. In Tract 380, 52.8% are high school graduates while in the rest of the city 79.9% are. Incomes and property values are lower in Tract 380 than in the rest of Summit as a whole.

Comparisons are between medians and means in Tract 380 and in the rest of the city. The evidence establishes that there are people and residences in many parts of the city in the same classifications as in East Summit as to financial means, color, national origins, education, etc.

East Summit is not a well defined area and its characteristics may vary with the selection of boundaries. The area defined by plaintiffs is not a slum or ghetto, and does not contain a homogeneous population of any racial, religious or political group, but a mixture of people. The population is mobile, as is demonstrated by the removal of one of four plaintiffs during the pendency of this action and the removal from the area of the councilman-at-large while in office and his subsequent reelection to office by the entire city.

There is no evidence whatsoever of discrimination on the basis of race, religion or national origin. The evidence shows no obstacle to voting by the residents of the districts referred to. It further shows that a very substantial proportion of city employees are residents of the area. The city has expended more money for education and recreation in this section than in other parts of the city. The evidence presented is undisputed that the city is well governed.

The two plaintiffs who testified, Mrs. Mosely, a black woman, and Mr. Cochario, a native of Summit of Italian parentage, found no fault with the actions of the governing body. They had no particular grievances. Their only complaint is that none of the members of the council are elected from East Summit. They feel that councilmen living elsewhere in the ward have not the same interest in their neighborhood and are not as available to hear complaints as an area councilman would be. Of the other two plaintiffs one has removed from the city. The other was away at the time of trial and did not testify.

The other witnesses for the plaintiffs were all nonresidents of East Summit. These were:

Michael Goodman, statistician.

William Holub, minority member of the Redistricting Commission.

Mrs. Jean Sinden, former president of the League of Women Voters.

Mrs. Helen Kadota, an active member of the League of Women Voters.

These witnesses were impressive. The position of the League of Women Voters, arrived at after extensive study, is particularly so because it is based on study and not upon self-interest. As expressed in a position paper in evidence it

* * * perfers division into four words, with three [counselmen] at large. It is the simplest and easiest to achieve and would, in our opinion make the Council more representative, more responsive and improve its decision making capability. * * *

*       *       *       *       *       *       *       *

The basis of our position on the need for more than two wards is our feeling that there are ethnic, racial and political differences which are submerged in multi-member voting districts. In studying the census data we have developed information on the diversity of the community.

The City also presented impressive testimony by Mayor Elmer J. Bennett and Councilman-At-Large and President of the City Council Frank H. Lehr. City Clerk Harry C.

Kates, Councilman Watson B. Smith, Jr., Joseph R. Angelo, Jr., self-styled "Mayor of East Summit," and Frank Liberato, a Republican Election Board member residing in East Summit, also testified. The last two expressed satisfaction with things as they are in East Summit.

The essence of the incumbents' argument is that East Summit residents are fully represented on the city council, participating in the choice of three councilmen in each ward, one elected each year, as well as the councilman-at-large and the mayor. They contend that men elected from half of the city are less likely to take a narrow provincial view but represent the best interests of the city as a whole. This arrangement is said to be less divisive and more unifying than having one councilman for each small local group of people.

In 1946 the United States Supreme Court refused to deal with unequal districting within the states. In *Colegrove v. Green,* 328 *U. S.* 549, 556, 66 *S. Ct.* 1198, 1201, 90 *L. Ed.* 1432, 1436 (1946), Mr. Justice Frankfurter said: "Courts ought not to enter this political thicket." That case has since been overruled. *Baker v. Carr,* 369 *U. S.* 186, 82 *S. Ct.* 691, 7 *L. Ed.* 2d 663 (1962).

In 1964, in *Reynolds v. Sims,* 377 *U. S.* 533, 84 *S. Ct.* 1362, 12 *L. Ed.* 2d 506, the United States Supreme Court held that the unequal apportionment of state legislative districts was a violation of the Equal Protection Clause of the Constitution of the United States. Mr. Chief Justice Warren there held: [377 *U. S.* at 555, 84 *S. Ct.* at 1378, 12 *L. Ed.* 2d at 523–524]

The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government. And the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote as effectively as by wholly prohibiting the free exercise of the franchise.

In *Avery v. Midland County, Texas,* 390 *U. S.* 474, 88 *S. Ct.* 1114, 20 *L. Ed.* 2d 45 (1968), the United States Supreme Court held that the right of each resident to have

his vote given equal weight with the vote of every other resident applies to units of local government and is constitutionally protected. Mr. Justice White said for the court:

> Although the forms and functions of local government and the relationships among the various units are matters of state concern, it is now beyond question that a State's political subdivisions must comply with the Fourteenth Amendment. The actions of local government are the actions of the State. A city, town or county may no more deny the equal protection of the laws than it may abridge freedom of speech, establish an official religion, arrest without probable cause, or deny due process of law.
>
> When the State apportions its legislature, it must have due regard for the Equal Protection Clause. Similarly, when the State delegates lawmaking power to local government, and provides for the election of local officials from districts specified by statute, ordinance or local charter, it must insure that those qualified to vote have the right to an equally effective voice in the election process. [390 *U. S.* at 480, 88 *S. Ct.* at 1118, 20 *L. Ed.* 2d at 50–51]

The attack here is solely upon the multimember districts. Such districts were sustained in *Fortson v. Dorsey,* 379 *U. S.* 433, 85 *S. Ct.* 498, 13 *L. Ed.* 2d 401 (1965) ; *Dusch v. Davis,* 387 *U. S.* 112, 87 *S. Ct.* 1554, 18 *L. Ed.* 2d 656 (1967), and *Whitcomb v. Chavis,* 403 *U. S.* 124, 91 *S. Ct.* 1858, 29 *L. Ed.* 2d 363 (1971). However, in *Fortson* it was said:

> It might well be that, designedly or otherwise, a multi-member constituency apportionment scheme, under the circumstances of a particular case, would operate to minimize or cancel out the voting strength of racial or political elements of the voting population. When this is demonstrated it will be time enough to consider whether the system still passes constitutional muster. [379 *U. S.* at 439, 85 *S. Ct.* at 501, 13 *L. Ed.* 2d at 405]

In *Whitcomb,* on the other hand, the court said:

> As our system has it, one candidate wins, the others lose. Arguably the losing candidates' supporters are without representation since the men they voted for have been defeated; arguably they have been denied equal protection of the laws since they have no legislative voice of their own. This is true of both single-member and multi-member districts. But we have not yet deemed it a denial of equal pro-

tection to deny legislative seats to losing candidates, even in those so-called "safe" districts where the same party wins year after year. [403 *U. S.* 153, 91 *S. Ct.* at 1874, 29 *L. Ed.* 2d at 381]

In *White v. Regester,* 412 *U. S.* 755, 93 *S. Ct.* 2332, 37 *L. Ed.* 2d 314 (1973), Mr. Justice White said for the court:

We affirm the District Court's judgment, however, insofar as it invalidated the multimember districts in Dallas and Bexar Counties and ordered those districts to be redrawn into single-member districts. Plainly, under our cases, multimember districts are not *per se* unconstitutional, nor are they necessarily unconstitutional, when used in combination with single-member districts in other parts of the State. * * * But we have entertained claims that multimember districts are being used invidiously to cancel out or minimize the voting strength of racial groups. * * * To sustain such claims, it is not enough that the racial group allegedly discriminated against has not had legislative seats in proportion to its voting potential. The plaintiff's burden is to produce evidence to support findings that the political processes leading to nomination and election were not equally open to participation by the group in question — that its members had less opportunity than did other residents in the district to participate in the political processes and to elect legislators of their choice. *Whitcomb v. Chavis, supra,* 403 *U. S.* at 149–150, 91 *S. Ct.* at 1872. [412 *U. S.* at 765, 93 *S. Ct.* at 2339, 37 *L. Ed.* at 324]

The question presented in this case is not whether it would be wiser or better to divide the city into more single member districts. The issue is rather whether the action taken by the mayor and city council deprives plaintiffs of their constitutional rights.

It is not enough to show that the voters of some districts have been outvoted by the voters in other districts in the same ward. In every contested election some are outvoted under our system, no matter what the size of the ward. In single member wards those voting against the successful candidate are as much defeated as the majority in the districts called East Summit. There cannot be a councilman for each voter. There is no constitutional requirement as to the number of people who shall make up a "cluster" of people entitled to a councilman. Every minority cannot be represented.

The representation of citizens in municipal governments has never been equal and cannot be. Minorities cannot in all cases be represented. Even under proportional representation or under any system of elections the views of some will certainly not be represented and cannot be in a representative government with majority or plurality rule.

The entire system of unequally dividing portions of the state into municipalities with local governmental bodies inherently produces unequal representation. Compare the share in municipal government of the 14 residents of the Borough of Teterborough, Bergen County, the 23 residents of the Borough of Pine Valley, and the 12 residents of the Borough of Tavistock in Camden County, with the 382,417 residents of Newark, 260,545 residents of Jersey City, and 112,664 residents of Elizabeth. Every resident of Summit has much less voice in local government than the residents of the tiny municipalities mentioned, and much more than the residents of the large cities. The losers in these big city elections are much more numerous than the East Summit residents and are as unrepresented as the losers in East Summit.

The City of Summit is relatively small. It would not be unreasonable to elect all councilmen at large. It cannot therefore be unreasonable that some be elected from each half of the city.

The evidence does not establish that smaller single member wards would necessarily more fairly represent the people of the community. It would be constitutionally permissible to provide for four or six wards with one councilman from each. It might be wiser to do so. But the plan adopted by the city is also constitutionally permissible.

The Court has no power to substitute its own view for the discretion entrusted by law to the municipal officials. See *Reisdorf v. Mayor, etc., Mountainside,* 114 *N. J. Super.* 562 (Law Div. 1971) where Judge Feller wrote:

Courts are enjoined by our Constitution and Home Rule Act to interpret statutes liberally in favor of the existence of local power to

deal with local needs. *Whelan v. New Jersey Power and Light Co.*, 45 *N. J.* 237, 251, 212 *A.* 2d 136 (1965).

\*        \*        \*        \*        \*        \*        \*        \*

The judiciary does ont pass upon the wisdom of a municipal ordinance, nor does it nullify decisions of a governing body merely because there is disagreement as to the wisdom of municipal action, or a debatable issue has been presented. *Fred v. Mayor, etc., Old Tappan*, 10 *N. J.* 515, 92 *A.* 2d 473 (1952).

Furthermore, factual support for local legislative action is presumed. Barring a showing contra, the assumption is that the measure has a rational basis within the knowledge and experience of municipal law makers. *Guill v. Mayor, etc., Hoboken*, 21 *N. J.* 574, 581, 122 *A.* 2d 881 (1956).

The wisdom of legislative action is reviewable only at the polls. The judicial role is tightly circumscribed. We may act only if the presumption in favor of the ordinance is overcome by a clear showing that it is arbitrary or unreasonable. *Kozesnik v. Montgomery Tp.*, 24 *N. J.* 154, 167, 131 *A.* 2d 1 (1957).

Judgment will therefore be entered in favor of the defendants denying the relief sought.